[No. B115199. Second Dist., Div. Five. Feb. 18, 1998.]

CONSTANCE K., Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND
FAMILY SERVICES, Real Party in Interest.

COUNSEL

Randall Pacheco, Carolyn Kemper and Lisa K. Rozzano for Petitioner.

No appearance for Respondent.

De Witt W. Clinton, County Counsel, Jill Regal and Kim D. Kedeshian for Real Party in Interest.

OPINION

**TURNER, P. J.—**

## I. INTRODUCTION

In this dependency extraordinary writ proceeding brought pursuant to rule 39.1B of the California Rules of Court, we confront the recurring and sometimes difficult issue of what is the appropriate ruling at a hearing pursuant to Welfare and Institutions Code section 366.22, subdivision (a)[1] when a parent has largely complied with the reunification plan yet nonconclusory reports prepared by responsible professionals indicate the return of a minor, or as in this case three minors, would create a substantial risk of detriment to the children. Because the reports in the present case are not merely written in a conclusory fashion and they are corroborated by specific acts of conduct on the part of the mother indicative of her inability to parent and protect the children, we conclude the present petition must be denied. In so concluding, we address the difference between the present proceeding and two types of cases discussed by other divisions of the Court of Appeal. In so ruling, we conclude the present proceeding is different from the "extreme" cases synthesized by Associate Justice Elizabeth A. Baron in the decision of

---

[1] All future statutory references are to the Welfare and Institutions Code.

*In re Brequia Y.* (1997) 57 Cal.App.4th 1060, 1068 [67 Cal.Rptr.2d 389], where appellate courts found trial judges abused discretion at a section 366.22 proceeding in setting a matter for a section 366.26 hearing to determine the permanent plan. Further, we conclude the present case is different from the situation discussed by Presiding Justice David G. Sills in the case of *Blanca P.* v. *Superior Court* (1996) 45 Cal.App.4th 1738, 1747-1742 [53 Cal.Rptr.2d 687], where conclusory reports which find no corroboration in the conduct of the parent are the sole basis for an order pursuant to section 366.22 setting a dependency proceeding for a permanency planning hearing as contemplated by section 366.26. Accordingly, we deny the petition for writ of mandate.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. *The July 26, 1994, Petition and Detention Report*

The petition was filed on July 26, 1994, by the Los Angeles County Department of Children and Family Services (the department). At the time the petition was filed, there were three minors named in the petition, Tara, Jynifer, and Randall.[2] The petition alleged Randall had been born drug dependent and the various parents had histories of illicit substance abuse. Randall, Jynifer, and Tara were taken into custody on July 24, 1994. The detention reports indicated the following. Randall was born and tested positive for opiates and methamphetamine. Randall was "not eating with a fast heart rate and fast respiration." By 1994, the mother had given birth to three other children other than Jynifer, Tara, and Randall. The mother had little knowledge as to the other three children other than their whereabouts. The mother was very remorseful and expressed "sincere love and concern for" Randall, Jynifer, and Tara. Jynifer and Tara indicated they wanted to remain with their mother.

### B. *The September 13, 1994, Detention Report*

The detention report prepared for September 13, 1994, indicated that the mother had a lengthy history of drug abuse which included methamphetamine use the day before Randall was born. The mother stated two of her older children, Benjamin and Joy, were detained because her residence was in disarray. Alex C., Tara and Jynifer's father, was on parole as a result of a methamphetamine sales conviction. The report continued: "The department and the court are well acquainted with this family. [The mother's] two oldest children were detained in 1987 and reunification was never actualized. . . .

---

[2]Randall is not a subject of these extraordinary writ proceedings. Parental rights were terminated as to Randall on January 24, 1996.

Since 1991 [the department] has received no less than seven emergency response referrals regarding the care of . . . Tara and Jynifer . . . . The family was provided with a variety of services in order to avoid detention and maintain the minors in the home." Prior to the detention of the minors, the mother had dropped out of a program at Tarzana Hospital. Both Jynifer and Tara enjoyed being with their mother.

### C. *November 28, 1994, Report*

On November 28, 1994, a report was prepared in connection with the results of the unsuccessful extended home visit of Tara and Jynifer. On September 27, 1994, the mother was granted a 60-day visit with Tara and Jynifer. During the extended visit, the mother did not comply with the case plan including positive drug tests and not participating appropriately in treatment programs. As a result, on November 11, 1994, Jynifer and Tara were placed again in foster care according to reports prepared by the agency placing the two minors. Tara and Jynifer were with the mother for 45 days before returning to the day-to-day custody of the department.

### D. *January 11, 1995, Report*

On January 11, 1995, a department report was filed which stated the foster care provider was decertified and the children were returned to the department's custody. The social worker recommended that there be no further contact between the former foster mother who was "decertified" and the minors.

### E. *The March 28, 1995, Case Plan Update*

On March 28, 1995, a case plan update was filed. It indicated the mother had been terminated from her drug treatment program in February 1995. Further, she had tested positive for drugs. The mother was in agreement with the department's assessments concerning Jynifer and Tara. The mother agreed she needed to comply with the case plan.

### F. *The July 17, 1995, Petition Application*

On July 17, 1995, according to a detention report, Kyrie, the mother's seventh child, born on July 15, 1995, was detained. The infant tested positive for alcohol. The mother tested positive for methamphetamines. By this time, in July 1995, the current foster parents were caring for Tara and Jynifer. Kyrie was placed with the foster parents who were also caring for Tara and Jynifer.

### G.   *The September 26, 1995, Case Plan Update*

A written case plan update was filed on September 26, 1995. It related: The mother was not in compliance with the case plan; Tara and Jynifer's father, Alex C., was not in compliance with the case plan; the mother had just entered a live-in program; and if she completed the program, reunification could become a realistic prospect. Tara and Jynifer had adapted well in the foster home. The foster parents enjoyed Tara, Jynifer, and Kyrie. The mother indicated she wanted her children returned. Attached to the written case plan update filed on September 26, 1995, were foster care agency reports as to Tara and Jynifer. The reports noted the two children were doing well in the foster parents' care.

### H.   *The January 24, 1996, Report*

A report prepared for January 24, 1996, indicated the mother remained in a live-in program. A social worker took the minors to visit the mother twice a month. Alex C., Tara and Jynifer's father, continued to fail to comply with the case plan. Further, the report noted that the 18-month period for reunification had expired.

### I.   *The March 26, 1996, Report*

A report prepared for March 26, 1996, indicated the mother had been enrolled in a residential treatment program called Patterns since September 11, 1995. She had been alcohol and drug free since entering Patterns. Also, the mother was participating in the various drug and counseling programs. The report contained evidence of negative drug tests. The report also indicated that Kyrie's father, Eric C., had just been released from prison and was on parole. Kyrie continued to suffer physical effects consistent with having been exposed to drugs prior to birth. The quarterly reports prepared by the foster agency indicated the minors were doing well in placement. The report regarding Tara noted: "Tara also enjoys her relationship with [the foster mother], and has expressed her desire to stay with the [foster parents] to [the foster mother] also stating that she has to go with her mom when the time comes because that's what her mom wants." The agency social worker recommended continued placement with the foster parents until the mother could care for the minors on a consistent basis.

### J.   *The May 9, 1996, Case Plan Update*

On May 9, 1996, a case plan update was filed. It stated that on April 29, 1996, the mother had been discharged from her treatment program at Patterns. The mother's counselor stated: "[The mother] was discharged from the

program on April 29, 1996 due to secretive behavior and being dishonest with staff. After being approached by staff and her primary counselor, she continued to refuse to discuss the situation therefore being unwilling to participate in the program and her own personal recovery." The mother then contacted the social worker. The mother only gave the social worker a telephone number and a room number. The report noted that the minors had "been in the DCFS system over 18 months and there is no guarantee the mother will be able to parent or provide for her children." The mother had visited the children on only one occasion between January 24, 1996, and the preparation of the May 9, 1996, report. The May 9, 1996, report concluded, "It appears mother is reverting back to old ways and making choices that are not in her or her children's best interest." Further, the May 9, 1996, report, which contained an adoption assessment, recommended the minors be adopted.

### K.  The June 30, 1996, Social Worker's Report

On July 30, 1996, a social worker's report indicated: The mother visited the minors on a weekly basis; the mother had been unable to act as a parent "for many years"; the mother continued to be dependent on others "to 'take care' of her"; the mother did not have the independence or capability to take care of herself; and it was therefore difficult to conclude she could "care for any of her children."

### L.  The September 24, 1996, Report

A report prepared for September 24, 1996, stated that the mother had completed her parenting program. Further, she visited the children each week and expressed love for the minors as well as a desire to be reunited with them. The report noted that all seven of her children were "either adopted, in the process of adoption, in legal guardianship [or] in continued foster care." The report adverted to an analysis prepared on June 24, 1996, by Dr. Michael Ward which indicated: The mother had a " 'fair amount of distress and disorganization and/or instability in [her] personality system' "; psychological testing indicated that " 'she has a tendency to view her world in somewhat angry, suspicious, hostile and generally negative terms' "; there was evidence of " 'an underlying personality disorder' "; and concluded there were ' "significant concerns about some underlying emotional instability and the possibility of relapse in terms of things like substance abuse.' " Dr. Ward's report indicated, " '[I]t would really take some time before one could have a lot of confidence that this individual has truly stabilized her life.' " The September 24, 1996, social worker's report concluded, "There is no guarantee mother will ever be able to parent these minors." The report

contained a letter from a 79-year-old widower who described the mother's living situation. The mother and Eric C. each paid $200 a month for the use of one of the bedrooms. They could use the kitchen and had access to the other portions of the residence. Moreover, the mother continued to have negative drug tests.

### M. *The October 24, 1996, Report*

A report prepared for October 24, 1996, indicated the mother had completed parenting classes and a drug diversion program. All of her drug tests were negative. The report requested that the social worker be authorized to liberalize visitation. Further, the report stated: "On 10-16-96 mother requested a letter for the doctor to give to general relief to state she was not able to partake in the job search due to she can not concentrate, that she cannot focus and that she is under stress. [O]n 10-16-96 mother stated to this writer that she was being asked to do too much. This writer then asked if what is being asked is too much then how does she expect to do the work she needs to do and also take care of children? Mother shruged [*sic*] her shoulders."

### N. *The November 11, 1996, Report*

A report was prepared for a November 11, 1996, hearing. It reiterated the contents of the October 24, 1996, report as well as Dr. Ward's previously stated diagnosis.

### O. *Dr. Ward's January 20, 1997, Report*

A 43-page report prepared by Dr. Ward reviewed an extensive array of psychological testing and analysis. The pertinent part of the report in terms of return of the minors to their mother is extensive and warrants being completely set forth: "On my Order of Appointment, the following question was specifically asked: 'Can minors be safely returned to the mother now; if not what would be needed to work towards return; if the Court proceeds to a permanent plan, what should the plan be?' [¶] I would not be able or willing to recommend that these minors be returned to their mother 'now.' As I have stated earlier, one would still have to have concerns about the possibility of relapse in a woman with her personality disorder type features and her significant substance abuse history. Additionally, not only would the children be returned to their mother, but they would be returned to a 'stepfather,' referring to the mother's boyfriend Eric, about whom I simply know very little, other than that he also has a history of substance abuse problems. One would have to know more about the stability of that relationship and situation before recommending that the children be placed with

their mother and this man. [¶] There is little doubt, whether one looks at the mother individually and/or as a couple with her boyfriend, that the current placement for these girls is much more stable than returning them to their mother. The foster parents appear to be very stable individuals who have obviously provided a good home for these children, which the mother openly recognizes and acknowledges. In practical terms, there is really no concern, worry, or risk if we allow the girls to remain with their foster parents, in contrast to the situation with their mother, especially when we also include their 'stepfather.' However, while the foster home is obviously a more stable and less risky placement, it is not the home of their mother, which is an extremely important fact that must be kept in mind. As I have often stated in these types of cases, the issue is not whether one home and/or parent(s) are better than the other, but whether or not the biological home is able and willing to care for these children. We could almost always find better parents and/or a home for most children if we were just going to talk about the stability and parenting skills of the caretakers in an abstract sense. However, and as is clearly indicated in the laws of our land, children should be with their parents unless there are very clear reasons why this should not be the case. [¶] . . . Given all of the above, and in light of the fact that I could not recommend that these two girls be returned to their mother 'now,' and given that the 18-month legal period has apparently expired, it does seem that some permanent plan for these children does have to be made. Again, in light of all of the issues, concerns, and circumstances of this case situation, I would recommend that the Court consider long-term foster care, precisely because I believe there is some definite value in allowing for the possibility of reunification in this case. In other words, and although I can understand those who want to proceed to adoption, I believe there is still some reason here for keeping the door open for possible reunification. What would have to happen in this regard is for the mother to continue with her sobriety and apparent increased stability in her life. It would also seem both necessary and appropriate to begin allowing some progressively expanded visitation between the mother and these girls. I see no reason why there could not be a progressively increased schedule of unmonitored visitation between these children and their mother, again, as long as the mother continues with her counseling, drug testing, and remains stable and sober. We could start out with allowing the mother to take the children for half-day and then all-day activities, and then proceed to some overnight visitation, culminating ultimately in weekend visitation. Assuming there are no major problems with this process, it would then be appropriate to have a trial visit home. Obviously, if all that is successful, it would then be appropriate to consider formal reunification."

### P.   *The January 22, 1997, Report*

The department's report prepared for January 22, 1997, recommended adoption as the permanent plan. Also, Jynifer's therapist recommended that

adoption be selected as the permanent plan. In a report dated January 15, 1997, Jynifer's therapist, Dr. Christine Campbell, a psychologist, stated: "When initially seen, Jynifer appeared highly anxious and depressed. She was irritable and controlling in her play at times. Over the four months she was seen in my office, these behaviors began to abate somewhat. Under the [foster parents'] care, she began to appear much less anxious and depressed. She was, however, consistently reticent in discussing her biological parents. Such discussion always led to increased anxiety and avoidance behaviors. [¶] Based on my clinical observations of this child, her interactions with foster mother and her discomfort with any mention of her biological parents, I would recommend consideration be given to severing parental rights so that this child can continue the progress she has made with the [foster parents]. Further contact with her biological parents will continue her sense of insecurity and distress and may inhibit the child from being able to develop a positive sense of self. She has become attached to the [foster parents], which portends well for her adjustment in the future. Further disruptions with her biological family could prove disastrous for her."

The department's January 22, 1997, evaluation contained a January 17, 1997, report prepared by a foster care agency. It indicated all three minors had lived together in the foster home since July 17, 1995, in Quartz Hill. The report prepared for Tara noted that she and Jynifer shared a room in the foster home. Tara would read stories to the mother during visits. The children appeared to be doing well in foster care. The social worker who prepared the report stated: "Tara continues to be in need of the safe and nurturing environment provided for her in the [foster parent's] home. Until it is deemed that the natural mother has made sufficient progress on her service plan, and demonstrates that she is able to care for Tara and her sister on a consistent basis, it is recommended that Tara continue in her placement with the [foster parents]."

The department's January 22, 1997, evaluation also contained a January 17, 1997, report prepared by a foster care agency for Jynifer. The report indicated: The child loved her foster family; she would ignore adults who were speaking to her; she took pride in having the same kindergarten teacher her older sister, Tara, had had the year before; Jynifer met with her mother once a week for one hour; and the foster parents provided appropriate discipline and boundaries. The foster care agency report concluded: "Jynifer continues to be in need of the safe and nurturing environment provided for her in the . . . foster home[.] Until it is deemed that the natural mother has made sufficient progress on her service plan, and demonstrates that she is able to care for Jynifer and her sisters on a consistent basis, it is recommended that Jynifer continue in her placement with the [foster parents.]"

## Q. *The March 13, 1997, Case Plan Update*

On March 13, 1997, a case plan update was prepared by the department. That report noted that the mother continued to undergo drug testing. Further, the visitation between the minors and the mother had been expanded to two hours per week. The report noted that the mother was allowing the minors to visit with Eric C., Kyrie's father. Eric C., a parolee, had missed in the two and one-half months prior to the preparation of the March 13, 1997, case plan update, eight of eleven drug tests. Also, he had tested positive in one of the three tests. Despite the repeated failure to comply with his testing schedule and a positive test, the mother stated she intended to marry Eric C. Once, the mother allowed Alex C., who was in complete noncompliance with the case plan, to come with her to the visit. The visit of Alex C., which included promises to the children he did not comply with, "upset[] the minors." The March 13, 1997, case plan update recommended adoption as the permanent plan. Attached to the March 13, 1997, case plan update was a note concerning the evaluation of the mother's therapist, Sam Hill. The report indicated the therapist: concluded the mother was making progress; recommended the commencement of "weeken[d] over[]night visitations"; and noted the mother desired to "continue reunification." However, the department social worker's note stated, "[The therapist] Mr. Hill continued to say mother will need to rely on AFDC for two or more years to bond, prior to the mother working on any type of career."

## R. *The April 28, 1997, Case Plan Update*

The case plan update prepared for April 28, 1997, indicated the minors had unmonitored weekly two-hour visits with the mother with whom they had bonded and which were "going well." The mother had "no plan" to provide for the minors according to the update. The mother stated she would not allow Eric C., who has repeatedly failed to comply with the case plan, to live with her until he was "in compliance with all the court orders." As noted previously, Eric C. is Kyrie's father. However, the mother and Eric C. were still quite close and their latest baby was due in the third week of May 1997. The update reiterated the prior recommendation that the minors be adopted.

## S. *Mr. Hill's May 5, 1997, Letter*

On May 5, 1997, Mr. Hill, a licensed social worker, addressed a letter to the trial court. That letter indicated the mother frequently attended "Narcotics Anonymous meetings" and was a "Group Service Representative" of that organization; completed a seven-month treatment program at the Patterns Treatment Program, enrolled in an out-patient alcohol treatment program;

completed eight weeks of parenting classes; attended weekly classes on coping with mental illness symptoms; and successfully drug tested for one year. Mr. Hill recommended return of the three minors with the mother to "remain in therapy during her first few months of active motherhood." The mother intended to receive welfare and attend school. Mr. Hill believed this would "permit her to have more time to learn and practice parenting than would full time employment."

### T. *The June 30, 1997, Report Concerning the Newborn Sibling of the Three Minors, Elena*

In the meantime, the mother gave birth to her eighth child, Elena. A section 300 petition was filed based in part on the mother's prior drug use. Additionally, the petition was premised on the father's drug and alcohol abuse. Elena was born with a negative toxicology screen. The father of Kyrie and Elena, Eric C., had failed to appear for drug testing. After her birth, Elena had been suitably placed with a foster mother. When Elena was returned from visitation with the mother, the infant did not appear to have been properly fed.

### U. *The June 30, 1997, Report Concerning the Three Minors*

A report prepared for the June 30, 1997, hearing involving Tara, Jynifer, and Kyrie recommended that these three minors be adopted. The report, after adverting to the positive factors concerning the mother, made the following comment: "It appears [the] mother is barely able to be responsible for herself and [it] is very questionable that she can parent these three children as well as her . . . newborn child . . . ." The social worker noted that the minors enjoyed being with the mother for the following reasons, "We can eat and drink as much as we want" and "we can watch TV a whole bunch, almost the whole time, almost 6 hours." Jynifer explained her preference for living with her mother as distinguished to the foster home as follows: "There are too many rules at this foster home. We can't eat what we want and we can't watch as much TV as I want." Tara indicated she wanted to live with her mother because, "I love her and she will let me eat and drink whatever I want." The social worker noted that it did not appear the mother had learned the lessons taught in the parenting classes.

On June 7, 1997, the mother requested a visit at the foster parents' place of business. This was because the mother was afraid Alex C. would " 'drop in.' " During the visit, the mother had "a hard time and appeared to be unable to handle all four children." Tara and Jynifer would not obey the mother. Finally, the foster mother had to tell Tara and Jynifer to listen to their natural

mother. The mother was unable to stay the full two hours. The report continued: "At other visits, mother has called to have the minors back early, before dinner. Mother made the comment it had been so long since she has fixed dinner . . . . [¶] Foster parents state there is a remarkable difference in the children after visits. [¶] Tara and Jynifer are hyper longer and longer and take considerable time to settle down. They do things they know they are not suppose[d] to do."

As to Kyrie, the two-year-old, she barely knew her mother. During an overnight visit, Kyrie got her diaper bag and clothes and walked to the front door of the mother's residence. Kyrie wanted to "go home." After the visit, Kyrie was "mad at everyone."

### V.   *The August 26, 1997, Social Worker's Report*

The social worker's report prepared for August 26, 1997, as to Tara, Jynifer, and Kyrie, discussed the unsuccessful nature of the weekend visits which apparently began in the latter part of March 1997. Often, the mother could not keep the children for the full weekends. This was because she could not control the minors. The mother would telephone the foster mother for help. After the weekend visits, the children would take three days to calm down. Eventually, it was discovered the fathers, Alex C. and Eric C., were present at the unmonitored weekend visits. The weekend visits for August 2 and 3 had to be stopped in order to deal with the problem of the mother being unwilling or incapable of keeping the fathers, Alex C. and Eric C., away from the minors. Before the visits recommenced, the mother agreed once again that the fathers could not be present during visits. The visit of Alex C. had upset Jynifer and Tara.

The mother was interviewed by the social worker. The mother stated she wanted Elena returned to her first because it would be " 'to[o] overwhelming' to have all the kids returned at one time." As noted earlier, Elena, who was fathered by Eric C., was the newborn sibling of the three minors. Like all of the mother's children, except Randall who had been adopted, Elena was subject to department supervision. Moreover, the mother was concerned about Kyrie, the youngest of the three minors, being taken from the foster parents. This was because they were the only parents Kyrie had ever known.

During a visit by the social worker in the mother's home, it was observed to be dirty and in disarray. The wires from the stereo presented a hazard. The mother had been advised a month before to correct the hazard involving the stereo wires. The mother had failed to do so. Moreover, one of the minors, Kyrie, during the visit had "a few ant bites" which were due to "an

unexpected invasion." Also, Kyrie had scraped her leg on a bolt during the visit.

The report indicated that Eric C. had begun drug testing. All five of his most recent tests were negative. The mother telephoned the social worker and asked permission to miss a drug test. The mother explained she had surgery on her nose. The mother was told that failure to undergo testing would be treated as a positive test. The mother then submitted to a drug test. The test result was positive for morphine. The mother admitted that the antipsychotic drug she ingested for panic attacks was not working and she would need to secure a different medication.

## III. DISCUSSION

### A. *Legal Considerations*

■ When the applicable law is applied, we conclude there was substantial evidence that return of the minors to the mother would create the requisite risk to the emotional or physical well-being of the three children. ■ Compliance with section 366.22, subdivision (a), is part of the dependency scheme which was described by the California Supreme Court as follows: "The objective of the dependency scheme is to protect abused or neglected children and those at substantial risk thereof and to provide permanent, stable homes if those children cannot be returned home within a prescribed period of time. (§§ 300, subd. (j), 361.5, 366.26, subd. (b); Task Force Report [on Child Abuse Reporting Laws, Juvenile Court Dependency Statutes, and Child Welfare Services (Jan. 1988)] pp. 1-2, 7, 10.) Although a parent's interest in the care, custody and companionship of a child is a liberty interest that may not be interfered with in the absence of a compelling state interest, the welfare of a child is a compelling state interest that a state has not only a right, but a duty, to protect. (*In re David B.* [(1979) 91 Cal.App.3d 184,] 192-193, 195; *Stanley* v. *Illinois* (1972) 405 U.S. 645, 649 . . . .) The Legislature has declared that California has an interest in providing stable, permanent homes for children who have been removed from parental custody and for whom reunification efforts with their parents have been unsuccessful. (§§ 366.25, subd. (a), 366.26, subd. (b); *In re Heather P.* (1989) 209 Cal.App.3d 886[,] 892 . . . .) This interest is a compelling one. (*In re Heather P., supra,* 209 Cal.App.3d at p. 892.) The state's interest requires the court to concentrate its efforts, once reunification services have been terminated, on the child's placement and well-being, rather than on a parent's challenge to a custody order. . . . [¶] . . . One section of the dependency law may not be considered in a vacuum. It must be construed with reference to the whole system of law of which it is a part

so that all may be harmonized and have effect. (*Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1386-1387 . . . .) The dependency scheme, when viewed as a whole, provides the parent due process and fundamental fairness while also accommodating the child's right to stability and permanency." (*In re Marilyn H.* (1993) 5 Cal.4th 295, 307 [19 Cal.Rptr.2d 544, 851 P.2d 826].)

Section 366.22, subdivision (a) requires at the 18-month hearing the following occur: "When a case has been continued pursuant to paragraph (1) of subdivision (g) of Section 366.21, the court, at the 18-month hearing, shall order the return of the minor to the physical custody of his or her parent or guardian unless the court finds, by a preponderance of the evidence, that the return of the minor to his or her parent or guardian would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the minor. The probation officer shall have the burden of establishing that detriment." ■ The purpose of the section 366.22 hearing was described by our colleague, Associate Justice Vance Raye, as follows: "At the other end of the continuum, however, the Legislature has determined a child's need for stability and security within a definitive time frame becomes paramount. The cutoff date for fostering family reunification is the 18-month status review. At this hearing, the court must return children to their parents and thereby achieve the goal of family preservation or terminate services and proceed to devising a permanent plan for the children. (. . . § 366.22.) 'The focus during the prepermanent planning stages is preserving the family whenever possible [citation] whereas the focus after the permanent planning hearing is to provide the dependent children with stable, permanent homes.' (*In re Michael R.* (1992) 5 Cal.App.4th 687, 695-696 . . . .)" (*In re Elizabeth R.* (1995) 35 Cal.App.4th 1774, 1788 [42 Cal.Rptr.2d 200].) Compliance with the reunification plan is certainly a pertinent consideration at the section 366.22 hearing; however, it is not the sole concern before the dependency court judge. (*In re Dustin R.* (1997) 54 Cal.App.4th 1131, 1139-1140 [63 Cal.Rptr.2d 269]; *In re Joseph B.* (1996) 42 Cal.App.4th 890, 901 [49 Cal.Rptr.2d 900]; *In re Elizabeth R., supra*, 35 Cal.App.4th at p. 1788.) Hence, in this case, the decision to be made at the section 366.22 hearing required the trial judge to return the minors to the mother or develop a permanent plan.[3]

At the section 366.22 hearing, a trial judge can consider, among other things: whether changing custody will be detrimental because severing a

---

[3]No doubt, under appropriate circumstances, a trial court does have the authority to continue any dependency hearing pursuant to section 352. (*In re Dino E.* (1992) 6 Cal.App.4th 1768, 1778-1779 [8 Cal.Rptr.2d 416]; *In re Elizabeth R., supra*, 35 Cal.App.4th at pp. 1797-1799.) However, the petition in the present case only requests return to the minors to the mother "forthwith." No issue is raised concerning a duty on the respondent court to continue the section 366.22 hearing. Hence, any such issue has been waived. (*Tiernan v. Trustees of*

positive loving relationship with the foster family will cause serious, long-term emotional harm (*In re Jasmon O.* (1994) 8 Cal.4th 398, 418-419 [33 Cal.Rptr.2d 85, 878 P.2d 1297]; *In re Bridget R.* (1996) 41 Cal.App.4th 1483, 1506 [49 Cal.Rptr.2d 507]); properly supported psychological evaluations which indicate return to a parent would be detrimental to a minor (*In re Jasmon O., supra*, 8 Cal.4th at p. 423; *In re Brian R.* (1991) 2 Cal.App.4th 904, 915 [3 Cal.Rptr.2d 768]); whether the natural parent maintains relationships with persons whose presence will be detrimental to the ward (*In re John V.* (1992) 5 Cal.App.4th 1201, 1212 [7 Cal.Rptr.2d 629]); instability in terms of management of a home (*ibid.*); difficulties a minor has in dealing with others such as stepparents (*In re Angelia P.* (1981) 28 Cal.3d 908, 924 [171 Cal.Rptr. 637, 623 P.2d 198]; *In re Jacqueline H.* (1979) 94 Cal.App.3d 808, 816-817 [156 Cal.Rptr. 765]); limited awareness by a parent of the emotional and physical needs of a child (*In re Dustin R., supra*, 54 Cal.App.4th at pp. 1141-1142); failure of a minor to have lived with the natural parent for long periods of time (*In re Brian R., supra*, 2 Cal.App.4th at p. 915); and the manner in which the parent has conducted himself or herself in relation to a minor in the past. (*In re Jasmon O., supra*, 8 Cal.4th at p. 424; *In re Laura F.* (1983) 33 Cal.3d 826, 833 [191 Cal.Rptr. 464, 662 P.2d 922].) As will be noted, all of these factors are present to varying degrees in this case.

██ Appellate justices review a respondent court's decision after a section 366.22 ruling as follows: "Evidence sufficient to support the court's finding 'must be "reasonable in nature, credible, and of solid value; it must actually be '*substantial*' proof of the essentials which the law requires in a particular case." ' [Citation.] 'Where, as here, a discretionary power is inherently or by express statute vested in the trial judge, his or her exercise of that wide discretion must not be disturbed on appeal *except* on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. [Citations.]' [Citations.]" (*In re Brequia Y., supra*, 57 Cal.App.4th 1060, 1068; see *In re Jasmon O., supra*, 8 Cal.4th at p. 415.) In the presence of substantial evidence, appellate justices are without the power to reweigh conflicting evidence and alter a dependency court determination. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318-319 [27 Cal.Rptr.2d 595, 867 P.2d 706]; see *In re Kimberly F.* (1997) 56 Cal.App.4th 519, 533 [65 Cal.Rptr.2d 495].)

In the present case, there was compliance in virtually all respects with the reunification plan in terms of completion of required classes and the like.

*Cal. State University & Colleges* (1982) 33 Cal.3d 211, 216, fn. 4 [188 Cal.Rptr. 115, 655 P.2d 317]; *Johnston* v. *Board of Supervisors* (1947) 31 Cal.2d 66, 70 [187 P.2d 686], disapproved on another point in *Bailey* v. *County of Los Angeles* (1956) 46 Cal.2d 132, 139 [293 P.2d 449].)

Further, there is no dispute that more than adequate reunification services were provided. Decisional authority construing the "substantial risk of detriment" (§ 366.22, subd. (a)) test in cases where the parent has substantially complied with the reunification plan was summarized in the case of *Blanca P.* v. *Superior Court, supra,* 45 Cal.App.4th at pages 1748-1750. *Blanca P.* was authored by our colleague, Presiding Justice Sills of Division Three of the Fourth Appellate District, and warrants quoting at length because it summarizes the applicable law: "The harder cases are, like the one before us, where the parent *has* complied with the service plan, but for some reason has not convinced a psychologist or social worker that it would be safe to return the child to the parent. The problem is not, as it were, quantitative (that is, showing up for counseling or therapy or parenting classes, or what have you) but qualitative (that is, whether the counseling, therapy or parenting classes are doing any good). These are sensitive cases, fraught with emotional overtones, because they invariably deal with an evaluation of the *personality, character and attitudes* of the parent. [¶] Three cases, *In re Jasmon O.* (1994) 8 Cal.4th 398 . . . , *In re Brian R.* (1991) 2 Cal.App.4th 904 . . . , and *In re Heather P.* (1988) 203 Cal.App.3d 1214 . . . , are instructive in making some legal sense of this area, particularly showing the quantum of evidence concerning a parent's personality, character and attitudes required to sustain a detriment finding. [¶] We begin with *Jasmon O.,* which, while it did not arise out of a section 366.22 detriment finding, discussed the question of psychological evaluations. There the court reviewed the evidence of whether a parent had failed to 'maintain an adequate parental relationship' under former [Civil Code] section 232, subdivision (a)(7). The majority and the dissent disagreed, among other things, on the use of certain psychological evidence to support a finding that the father had not done so. Writing for the majority, Justice Mosk noted that '[w]ithout the testimony of psychologists, in many juvenile dependency and child custody cases superior courts and juvenile courts would have little or no evidence, and would be reduced to arbitrary decisions based upon the emotional response of the court.' (*In re Jasmon O., supra,* 8 Cal.4th at p. 430.) [¶] And the psychological evidence in *Jasmon O.* was indeed formidable. The seven-and-one-half-year-old child had spent virtually her entire life in foster care, a point made forcefully in the opening paragraph of the opinion. (See 8 Cal.4th at p. 407.) The father suffered from drug dependency and mental illness, but eventually turned his life around. No less than four psychologists—the child's treating psychologist, another child psychologist, a psychoanalyst (who was also an expert in child psychology) and even the father's own psychologist—all agreed that the *child* would suffer severe psychological harm if placed ('returned' would not be the right word) in the father's care. The psychological trauma of being so placed meant 'serious lifelong emotional detriment' and 'serious mental illness' for the child. (See *id.* at p. 416.) Moreover, the child's 'separation

anxiety' was objectively demonstrable: there was disruption of toileting and sleeping patterns, violent fantasies involving kidnapping, and difficulty relating to other children. (*Id.* at p. 417.) [¶] *Brian R.* dealt with the issue of detriment more directly. There, the father had 'made substantial strides' in curing the problems that led to the dependency. He now tested 'clean' for illegal drugs, had completed a parenting class, was receiving domestic abuse counseling, was consistently visiting his child, and had stable employment and housing. (2 Cal.App.4th at p. 913.) He had, like the father in *Jasmon O.*, turned his life around. [¶] However, a psychologist concluded that 'despite this reversal' the father 'did not have the capacity to parent.' (2 Cal.App.4th at p. 913.) Based on 'testing and on clinical evaluations' the father had a 'nonspecific, long-standing personality disorder with marked antisocial, dependent, and passive-aggressive features.' He 'rationalized his abuse of his domestic partners; and he had a problem with taking responsibility.' Thus if the child were returned, there was still the risk of abandonment. Plus, the father was 'likely' to change residences and caretakers and to develop 'unstable, unhealthy relationships' which would entail 'possible domestic abuse.' (*Ibid.*) This evidence, held the Court of Appeal, was not too speculative, because it was 'expert opinion testimony, based on psychological testing and clinical evaluation.' (*Id.* at p. 915.) [¶] *In Heather P.*, on the other hand, a mother with a 'history of mental problems,' a 'very transient lifestyle' (she had been described as a 'bag lady'), mental illness, and a suicide attempt, turned her life around relatively late in the dependency process. She met the elements of the service plan, obtained a stable residence, and began working in a church nursery. The social worker, however, still considered it detrimental to return the child to her mother because the mother's therapist, although noting progress, did not give her a positive evaluation for neglect or endangerment. Further, another psychologist had written somewhat earlier in the case that the mother did 'not exhibit adequate, nondetrimental or healthy parenting capabilities.' (See *In re Heather P.*, *supra*, 203 Cal.App.3d at pp. 1219-1223, 1227, 1229.) The Court of Appeal declared that the psychologist's opinion was *in*sufficient to justify a detriment finding. The earlier psychologist had provided merely 'general statements' about the parent's psychological condition, but had not demonstrated 'with specificity how the minor would be harmed.' The other psychologist's statements were not only 'outdated,' but were 'not the type of evidence which could be deemed credible and of solid value and from which the juvenile court could conclude that [the] minor's physical or emotional well-being would be threatened if she were returned' at the time of the review hearing. (*Id.* at pp. 1229-1230.)" (45 Cal.App.4th at pp. 1748-1750, original italics, fn. omitted.) As will be noted, the foregoing authority is largely but not entirely relevant because there are other factors indicative of a substantial risk of detriment in this case other than merely reports by qualified psychologists, counselors, and social workers.

## B. Application of the Legal Standards for Section 366.22 Determinations to the Present Case

We agree with the mother concerning the presence of evidence there would be no risk of substantial detriment if the children were returned to her. She had completed her program. Further, Mr. Hill, a licensed social worker, recommended return of the children.[4] Also, Dr. Ward's report adverted to the bonding that existed between the mother and Tara as well as Jynifer. Many of the department reports also adverted to the love between the mother and the two older children.

However, we agree with the department that the countervailing revelations in the various reports constituted substantial evidence of the risk of requisite detriment if the three children were returned to the mother. The mother had never had custody of any of her eight children on a full-time basis and been drug free. All eight of her children were the subject of dependency court jurisdiction or had been adopted. Qualified mental health professionals who were familiar with her relationship with her children concluded the mother would be unable to cope with the return of the three minors at present. These professionals included Dr. Ward and Nancy Mars, the department's social worker, who both concluded that the mother should not now have custody of the minors. Dr. Campbell, who was Jynifer's therapist, recommended a termination of parental rights. Each of these evaluations reflected nonconclusory and professional consideration of the evidence indicative of a substantial risk of detriment.

Moreover, there was evidence that the mother was incapable of acting as a proper parent when the minors were in her custody even for brief periods of time. She had regularly allowed the minors to be in the presence of the various fathers, Alex C. and Eric. C., who had previously been to prison as convicted felons and had long histories of failing drug tests. Simply stated, she could not control the fathers whose presence without question has been detrimental to the emotional well-being of the two older children. A March 1997 case plan update noted the presence of Alex C. caused anxiety on the part of Tara and Jynifer. The mother had virtually no full-time visitation and was unable to handle the situation when it was accorded to her on a weekend basis. It was not until March 1997 that the mother was able to keep the

---

[4]Mr. Hill's analysis has an identifiable flaw in it—he incorrectly assumed the mother had completed the Patterns live-in program. In fact, she was terminated from the program and did not complete it when the evidence is viewed in a light most favorable to the respondent court's orders. (*In re Stephanie M.*, *supra*, 7 Cal.4th at pp. 318-319; *In re Kimberly F.*, *supra*, 56 Cal.App.4th at p. 533.)

children overnight. The results were indicative of dangers to the children if placed full-time in the mother's custody. The June 30, 1997, report indicated the mother allowed the children to do as they please and did not set appropriate boundaries. On June 7, 1997, the mother had to visit the minors at the foster parents' place of business because she was afraid Alex C. would drop in on her. During the June 7, 1997, visit, the minors would not obey their mother. The foster mother had to tell the children to obey the natural mother. Further, the mother would return the minors early from visits before dinner. The mother admitted it had been "so long" since she had fixed dinner. The mother was often unable to keep the minors for even a full weekend. Because she could not control the minors during the weekend visits, the mother would call the foster mother for help. After the weekend visits, the minors would be "hyper" for three days. The inability of the mother to cope with the pressures of handling all three minors was demonstrated by her admission that it would be " 'to[o] overwhelming' to have all the kids returned at one time." In fact, because of the overwhelming prospects of such a situation, the mother did not even want custody of the three minors who are the subject of this appeal to be given to her until she had resided full time with Elena, the infant who was fathered by Eric C., the parolee who tested positive for narcotics or failed to appear for drug tests. During a home visit, the residence was in disarray, the mother had failed to correct a hazard involving a stereo, and Kyrie had sustained minor non-life-threatening injuries. Moreover, the mother had tested positive for morphine shortly after the weekend visits began although she claimed it was because of surgery on her nose. As the section 366.22 hearing approached, the mother began to have problems with the antipsychotic drug she took for panic attacks. Finally, the mother regularly had a difficult time during visits keeping Alex C. and Eric C. away from the minors. The mother wanted to marry the drug-dependent Eric C.

Further, return of the minors to the mother would be detrimental to the three children because it would end the loving and stable relationship which had developed over a two-year period in the foster home and place the minors in the problematical environment with their mother. The minors were entitled to stability, something that had developed in the foster home. The respondent court reasonably could have concluded that the minors' right to stability with the foster parents, who were willing to consider adoption, outweighed the mother's right to custody. (*In re Jasmon O., supra*, 8 Cal.4th at p. 419; *In re Bridget R., supra*, 41 Cal.App.4th at p. 1504.) Taken together, all of the foregoing constituted substantial evidence which supported the respondent court's orders pursuant to section 366.22.

## C. *Decisional Authority Favorable to the Mother's Position*

We agree that there are circumstances where a dependency court determination at the section 366.22 hearing must be set aside in extraordinary writ proceedings. These "extreme" cases were digested by Associate Justice Baron in the decision of *In re Brequia Y.*, *supra*, 57 Cal.App.4th at pages 1067-1068, as follows: "There are circumstances in which appellate courts have permitted reunification services to continue beyond the 18-month statutory period. For example, in *In re Dino E.* (1992) 6 Cal.App.4th 1768 . . . , no reunification plan was ever developed for the father, thus the appellate court ordered such services to be provided. In *In re Daniel G.* (1994) 25 Cal.App.4th 1205 . . . , the juvenile court characterized the reunification services offered to the mother as a " 'disgrace,' " but felt constrained to order a hearing on a permanent plan because the 18-month hearing date had arrived. The appellate court reversed to give the juvenile court the opportunity to properly exercise its discretion to continue reunification services. (*Id.* at p. 1209.) Another extreme example is the case of *In re Elizabeth R.* (1995) 35 Cal.App.4th 1774 . . . . There, the mother had been hospitalized during most of the 18 months, yet she had substantially complied with the reunification plan and her record of visitation was exemplary. The appellate court reversed the judgment terminating the mother's parental rights and remanded the case to permit the juvenile court to exercise its discretion under section 352 to continue reunification services. (35 Cal.App.4th at pp. 1777-1778.)" Further, in *Blanca P.* v. *Superior Court*, *supra*, 45 Cal.App.4th at pages 1751-1752, the Court of Appeal, in an opinion authored by Presiding Justice Sills, held that the following did not constitute sufficient evidence of a substantial risk of detriment: "We have no clinical evaluation, no testing to indicate mental illness, just the opinion of the mother's social worker and a therapist that she has not 'internalized' what she has learned in parenting classes. [¶] This failure to 'internalize,' moreover, is seen largely by the social worker and therapist as the result of Blanca's refusal to believe her husband is a child molester. When we look at just the subject of excessive corporal punishment, interestingly enough, the evidence is undisputed that Blanca has said she has learned that she should not use excessive force in child discipline. Indeed, her comments as related (but not believed) by the social worker are that she is willing to forswear corporal punishment altogether. Thus apart from the molestation, the case against Blanca boils down to the fuzzy notion that she does not truly believe what she has been taught about child discipline—a subject about which there is controversy even among experts and which is hard enough for *any* parent to master. [¶] Let us be plain. The idea that, despite enduring countless hours of therapy and counseling (much of it predicated on the possibly erroneous assumption that her husband is a child molester), a parent

who has faithfully attended required counseling and therapy sessions must still relinquish her child because she has not quite 'internalized' what she has been exposed to has an offensive, Orwellian odor. The failure to 'internalize' general parenting skills is simply too vague to constitute substantial, credible evidence of detriment. To hold otherwise would come perilously close to allowing legal decisions of monumental importance to the persons involved to be based on nebulous ideas more appropriate to an afternoon talk show than a court of law. (Cf. *Simms* v. *State, Dept. of Health & Rehab.* (Fla.Dist.Ct.App. 1994) 641 So.2d 957, 962-963 (dis. opn. of Jorgenson, J.) [describing as 'psycho-babble' vague testimony that mother lacked 'sense of "self" ' or ability or motivation to improve parenting skills]; see also Alexander, *Big Mother: The State's Use of Mental Health Experts in Dependency Cases* (1993) 24 Pacific L.J. 1465, 1493-1494 ['When adult patients fail to agree with their therapists, psychological terms help the therapist explain that the patient is wrong. She may be seen as *projecting* her own problems or *denying* reality, to illustrate two professional buzzwords.'] . . . .)" (Original italics, fns. omitted.)

The present case is entirely different from those decisions digested by Associate Justice Baron in the decision of *In re Brequia Y.*, *supra*, 57 Cal.App.4th at pages 1067-1068. In the present case there is no dispute that sufficient reunification services were provided. Further, unlike the somewhat similar situation in the case of *In re Elizabeth R.*, *supra*, 35 Cal.App.4th at pages 1777-1778, the mother in the present case was given a lengthy period of time to reunite with the children after the completion of her drug diversion program. Similarly, the present case does not involve conclusory reports by therapists or social workers such as in Presiding Justice Sills's analysis in the case of *Blanca P.* v. *Superior Court*, *supra*, 45 Cal.App.4th at pages 1751-1752. By contrast, in the present case, the reports included: evidence of extensive psychological testing; nonconclusory analysis of the mother's conduct as it related to specified mental disorders and her ability to function in a parental role; similar analysis by Jynifer's therapist; a decade-long history of difficulty of assuming the role of a parent; specific examples of how the mother failed to act properly as a parent when she had custody of the three minors even for only weekends; as to Kyrie, she barely knew her mother; and a clear distinction between a stable foster home and a chaotic existence for the three children when they would spend only a weekend with their mother. These types of evidence were not present in *Blanca P.* to the degree they are in the present case. None of the cases which would be supportive the mother's position warrant or even permit setting aside the section 366.22 orders in the present case.

## IV. DISPOSITION

The petition for writ of mandate is denied on the merits.

Jackson, J.,* concurred.

**ARMSTRONG, J.**—I respectfully dissent. The record contains no substantial evidence that, as of the date of the Welfare and Institutions Code section 366.22 hearing on August 26, 1997, the return of the minors to their mother would constitute a substantial risk of detriment to their physical or emotional well-being. I would therefore grant the mandate petition.

The majority begins its analysis with the statement: "We agree with the mother that there is evidence there would be no risk of substantial detriment if the children were returned to her." (Maj. opn., *ante*, at p. 708.) The majority decides the case, however, on "the countervailing revelations in the various reports," finding that these countervailing revelations "constituted substantial evidence of the risk of requisite detriment if the three children were returned to their mother." (*Ibid.*)

The "countervailing revelations" for the finding of risk of substantial detriment are the following: (1) petitioner has never had custody of any of her eight children "on a full time basis and been drug free" (maj. opn., *ante*, at p. 708); (2) all eight of petitioner's children are currently subject to dependency court jurisdiction or have been adopted; (3) return of the minors to petitioner would be detrimental "because it would end the loving and stable relationship which had developed over a two-year period in the foster home . . ." (*id.* at p. 709.); (4) the mental health professionals concluded that petitioner would be unable to cope with return of the three children at the present time; and (5) there is evidence that petitioner is "incapable of acting as a proper parent" while the children are in her custody (*id.* at p. 708).

In my view, the first three factors cited by the majority are irrelevant to this proceeding. Dependency proceedings begin because a parent has a problem, and require the government to provide services through which the parent can overcome that problem. "The purpose of the [service] plan is to overcome the problem that led to removal in the first place." (*Blanca P. v. Superior Court* (1996) 45 Cal.App.4th 1738, 1748 [53 Cal.Rptr.2d 687].) To hold that the existence of a problem at the beginning of the proceedings could constitute substantial evidence of substantial risk of detriment three

---

*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

years later would be contrary to the intent of the Legislature, and to the law. As this very court acknowledged only last month in an opinion authored by Presiding Justice Paul Turner, "Family preservation is the first priority when dependency proceedings are commenced. [Citations.]" (*Mark N.* v. *Superior Court* (1998) 60 Cal.App.4th 996, 1010 [70 Cal.Rptr.2d 603].)[1]

Moreover, I find troubling the majority's reliance on *In re Jasmon O.* (1994) 8 Cal.4th 398 [33 Cal.Rptr.2d 85, 878 P.2d 1297] to support a finding of detriment because return of the children to their mother would terminate the foster relationship. It must be understood that *any* outcome of this dependency proceeding will result in detriment to the children: They will lose either the love and affection of their mother, whom they love and want to live with, or of their foster parents, with whom they have developed loving bonds during their time in their home. However, the fact that the children will lose the love and support of their foster parents cannot, standing alone, form the basis of a finding of substantial risk of detriment, and *Jasmon O.* does not hold otherwise.

In *Jasmon O.*, the "mental health professionals" opined that the minor never developed a close relationship with her father and suffered acute anxiety as visitation with her father increased, and that the father "failed to or was unable to empathize with his daughter's distress." (*In re Jasmon O.*, *supra*, 8 Cal.4th at p. 408.) Under those circumstances, when the evidence was that the child had not developed a parent/child relationship with the parent and did not trust the parent to care for her, but did develop an attachment to her foster parents, a divided court upheld the trial court's finding that return of the minor to her father would be detrimental to the child. That is a far cry from the evidence in this case, where Dr. Ward, the only mental health professional to observe the interactions of petitioner and her children, attested to the strong bond between them, and Tara and Jynifer expressed a desire to return to their mother's care.

---

[1]DCFS (the Los Angeles County Department of Children and Family Services) argues that the possibility that petitioner will return to drug use provides sufficient evidence for the required finding of substantial detriment. Thus, DCFS sites Dr. Michael Ward's report which states that "while [petitioner] has been clean and sober for some time, given these data and her past history, one would still have to have significant concerns about some underlying emotional instability and the possibility of relapse in terms of things like substance abuse." After noting that petitioner has commented on the difficulty of caring for young children, DCFS concludes, "Therefore, there is a risk that if petitioner had difficulties and the responsibility became too great, she could relapse."

To allow children to be permanently removed from their home due to the possibility that their mother, though currently sober and in full compliance with the case plan, might return to drug use would turn the statutory scheme into a farce. Furthermore, in the unlikely event the mother did relapse and place the children at risk because of her use of drugs, DCFS would be free to initiate a new proceeding based upon facts occurring after the return of the children to the mother.

The real gist of the matter here, however, and what is most troubling to me, is the nature of the evidence presented to support the conclusion of the social worker, the trial court, and the majority, that petitioner is not a "capable" parent. The trial court cited in support of its order that petitioner "has not demonstrated the ability to parent the children." Thus, in remarks directed to petitioner, the court states: "The problem is that after more than three years there is not before the court any evidence of a demonstrated ability to parent the children on a long-term regular basis. And the evidence before the court is that, notwithstanding all of the accomplishments that you have made in your personal life, you have overcome the drug problem. You have gone to the individual counseling, you demonstrated personal and adult responsibility, but there is not a demonstrated ability to take care of the children on a regular basis, so I can't let the children go back today." This comment places the burden of proof squarely on petitioner. However, it is the DCFS who has the burden to establish that the return of the children to petitioner would create a substantial risk of detriment to their physical or emotional well-being. (Welf. & Inst. Code, § 366.22, subd. (a).)

The appellate court in *In re Heather P.* (1988) 203 Cal.App.3d 1214 [250 Cal.Rptr. 468] reversed a finding of substantial risk of detriment on just this type of evidence. In that case, the petition, filed when the minor was a year old, alleged that the mother had been arrested on an out-of-county warrant for theft, had a history of mental problems, and had had two other children removed and subsequently freed for adoption due to the mother's inability to care for them. The petition was sustained.

The countervailing revelations contained in the various reports included in the record in *Heather P.* indicated that prior to Heather's birth, her mother had been repeatedly hospitalized for mental illness, had suffered "regular incarcerations," and was "in and out of therapy and terribly transient in her living arrangements." She was described by her own foster mother as a "bag lady," and had been diagnosed as a paranoid schizophrenic who failed to exhibit "adequate, nondetrimental or healthy parenting capabilities." (203 Cal.App.3d at p. 1220.)

At the 18-month hearing, the court found that there had been "moderate compliance" with the reunification plan: She had maintained her residence for approximately one year, had maintained regular monthly visits with her daughter, and had received parent education and psychotherapy. The mother's therapist had previously stated, in a report presented at the 12-month hearing, that the mother had made progress in therapy, but that "more of an improvement is required before the minor could be allowed back into [the mother's] physical custody." In addition, the social worker's report stated

that "initially Heather is reluctant to have contact with [the mother] and must be coaxed by her mother. Heather interacts even less with her mother when other adults are present in the room." (203 Cal.App.3d at p. 1222.) Thus, although the mother "completed the requirements of the service plan, the social worker could not recommend that Heather be placed in her custody because [the mother] had not received a positive evaluation from her therapist indicating that the minor would be at a low or no risk for neglect or endangerment if she were returned to [her mother's] custody." (*Id.* at pp. 1222-1223.) Based on the foregoing, the trial court found that return of the child to her mother's custody would create a substantial risk of detriment to the physical or emotional well-being of the child, and ordered that permanency planning proceedings be conducted pursuant to Welfare and Institutions Code section 366.25.

The Court of Appeal reversed the trial court order, holding that the finding was not supported by substantial evidence. Specifically, the court held that the social worker's, and trial court's, reliance on the absence of a positive evaluation from the mother's therapist improperly shifted the burden of proof to the mother in contravention of the statute, and that the social worker's report, which was essentially the only evidence received at the hearing, failed to establish by a preponderance of the evidence that the return of the child would create a substantial risk of detriment to the physical or emotional well-being of the child. (203 Cal.App.3d at pp. 1226-1228.)

Like the court in *Heather P.*, I believe that the trial court here impermissibly shifted the burden of proof to the mother, so that she was required to prove her "ability to parent" the children, and that the social worker's reports, which constituted the great bulk of the evidence presented below, failed to establish by a preponderance of the evidence that the return of the children to their mother would create a substantial risk of detriment to their physical or emotional well-being.

The majority finds compelling the "fact" that petitioner is "unable to handle" weekend visits. The social worker arrived at this conclusion, in turn, based on the fact that petitioner called the foster mother with questions regarding care of the children during the early weekend visits; that petitioner cut two of eight weekend visits short, one because she was sick and the other because Tara and Jynifer's father, whom DCFS had told petitioner not to permit to visit the girls, indicated that he was going to visit; that two-year-old Kyrie scraped her leg on a bolt that was protruding from a bed which petitioner was assembling for her; that petitioner's home was "in disarray with toys and clothing on the living room floor [and] a sink full of dirty dishes as well as dirty dishes on the kitchen counter;" that petitioner allows

the children to eat sugary foods and watch television for extended periods of time, and other, similar behaviors.

The fact that petitioner seeks help from the foster mother when she needs it is, in my estimation, a positive trait, not a negative one. Likewise, that petitioner is resisting the actions of one of the fathers in seeking to insert himself into this family's life should be applauded and assisted, not cited as evidence that she is an unfit mother. And the social worker's observations of toys and clothes scattered around the living room, dirty dishes in the kitchen, the consumption of too much junk food and the watching of too much TV are evidence of modern living (and the frequent complaint of grandparents), not of a risk of substantial detriment to the physical or emotional well-being of the minors.[2]

Petitioner's parenting ability is also questioned based on her candid admission that the prospect of caring for three active, young girls can be overwhelming. The honesty and forthrightness of petitioner exhibited in this statement were qualities extolled by Dr. Ward in his Evidence Code section 730 report, but seen by the DCFS as evidence of "inability to parent." Surely a parent's frank assessment of the daunting enterprise of parenting should not be turned on its head and treated as evidence of unfitness to parent.

I note as well my concern that the only live testimony at the hearing to determine the fate of these three children is that of petitioner herself. The remainder of the evidence consists of various reports and correspondence submitted by the social worker Nancy Mars, the Evidence Code section 730 evaluator Dr. Michael Ward, petitioner's therapist Samuel Hill, and Jynifer's therapist Christine Kaye Campbell. Thus, the conclusions of the mental health professionals were not tested by cross-examination. Of the documentary evidence presented, the only current professional report presented to the trial court at the time of this hearing was that of the social worker, who had decided shortly after being assigned to this case in late 1995 or early 1996 that these children should be adopted. Unfortunately, Dr. Ward's most current report, in which he recommended continued reunification services, was dated January 20, 1997, and thus was eight months old at the time of this hearing. Likewise, the "professional opinion" evidence provided by Jynifer's therapist consisted of a three-paragraph letter dated January 15, 1997, based on eight individual counseling sessions with Jynifer during the previous summer. This is not the type of evidence which we should be

---

[2]The record before us contains no evidence that these conditions have been detrimental to the physical or emotional well-being of the minors. The issue is not whether the petitioner is living up to the social worker's standard of a "good parent," but whether the parent's conduct is harmful to the children.

relying on in making decisions which, no matter the outcome, will permanently affect the lives of these children.

In sum, I believe that the evidence relied on to support the finding of substantial risk of detriment in this case is in the same vein as the "failure to 'internalize' general parenting skills" which the Court of Appeal found "simply too vague to constitute substantial, credible evidence of detriment" in *Blanca P*. v. *Superior Court, supra,* 45 Cal.App.4th at page 1751.

At the time this case was set for permanency planning, petitioner had received the required drug counseling, had tested clean for almost two years, and was maintaining a drug-free home. She completed the proscribed parenting classes and faithfully participated in individual counseling until her therapist became ill. At the time of the hearing, petitioner was scheduled to resume counseling with another therapist. Petitioner made herself available for drug-testing, was free of drug use, and had regular and happy visits with her children. There is no indication of any domestic violence in her home or in her relationship with her children. She had thus done everything the court had asked her to do and had remediated every circumstance which caused the petition to be filed.

In my view, the "substantial risk of detriment to the physical or emotional well-being of the minor" standard set forth in Welfare and Institutions Code section 366.22 is essentially the same as that applicable to the initial assumption of jurisdiction over the minors. (Welf. & Inst. Code, § 300.) That is to say, if the behaviors of petitioner which the DCFS cites as deficient would not bring the minors within the jurisdiction of the court under a new petition, the provisions of section 366.22 have not been met. Here, in the final analysis, the DCFS based its recommendation that these children be taken from their mother and put up for adoption on its assessment of petitioner's deficient parenting skills. I do not believe that the Legislature intended that children be deprived of their parents, and parents of their children, because the parent is less than ideal.

"Our society does recognize an 'essential' and 'basic' presumptive right to retain the care, custody, management, and companionship of *one's own child*, free of intervention by the government. [Citations.] Maintenance of the familial bond between children and parents—even imperfect or separated parents—comports with our highest values and usually best serves the interests of parents, children, family, and community. Because we so abhor the involuntary separation of parent and child, the state may disturb an existing parent-child relationship only for strong reasons and subject to careful procedures." (*In re Kieshia E.* (1993) 6 Cal.4th 68, 76 [23 Cal.Rptr.2d 775, 859 P.2d 1290].)

In sum, the evidence here presented establishes that petitioner, like many parents, is not an ideal caretaker or role model. However, this evidence does not establish a substantial risk of detriment to the physical and emotional well-being of these children. Put another way, the children are not currently being abused or neglected when in petitioner's care, and there is no evidence in the record to conclude that they would be at substantial risk of abuse or neglect if returned to their mother's custody. (See Welf. & Inst. Code, § 300, subd. (j).) Accordingly, I would grant the mandate petition.

Petitioner's application for review by the Supreme Court was denied April 29, 1998.