Filed 7/24/14  G.C. v. Super. Ct. CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

|  |  |
|---|---|
| G.C.,<br><br>        Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF CONTRA COSTA COUNTY,<br><br>        Respondent;<br><br>CONTRA COSTA COUNTY CHILDREN AND FAMILY SERVICES BUREAU,<br><br>        Real Party in Interest. | A141773<br><br>(Contra Costa County<br>Super. Ct. No. J12-01355) |

Petitioner G.C. seeks extraordinary relief from the juvenile court's orders terminating reunification services and setting a hearing under Welfare and Institutions Code[1] section 366.26 to select a permanent plan for his son, J.C. (born April 2006). Having carefully reviewed the record, we deny petitioner's request for extraordinary relief on the merits and affirm the orders of the juvenile court.

## BACKGROUND

Contra Costa County Children and Family Services Bureau (Bureau) filed a section 300 juvenile dependency petition in regard to J.C. in September 2012. The petition alleged J.C.'s mother, R.C. (mother), is unable or unwilling to provide consistent adequate care and support for J.C. due to issues of alcohol abuse and that mother left J.C.

---

[1]  All further undesignated statutory references are to the Welfare and Institutions Code.

without making provisions for his support. The Bureau's detention report relates mother and her three children (J.C. and his two older half-siblings) were staying with a friend of the family (Ms. F.) on a temporary basis in September 2012. Ms. F. reported she confronted mother for drinking while residing in her home. Mother left Ms. F.'s residence to go to a nearby city to apply for a food stamp program and did not return. Mother did not return calls from Ms F., who then called the Bureau, and the children were taken into protective custody. Mother's whereabouts were unknown.

### *Jurisdiction/Disposition*

The Bureau requested additional time prior to disposition in order to locate petitioner, mother, and the father of one of J.C.'s half-siblings. The disposition report dated December 6, 2012, relates a social worker spoke with petitioner on December 3. Petitioner was in Las Vegas, planned to return to California in two days, was on the waiting list for a homeless shelter in Concord, and was unemployed. Petitioner last saw J.C. three months ago when he was living with mother and her children in a hotel; petitioner left after arguing with mother. Subsequently, the Bureau reported petitioner was residing in a local drug and alcohol inpatient program at Discovery House, and that it was in the process of scheduling twice monthly visits between petitioner and J.C.

Following a jurisdiction/disposition hearing held on January 7, 2013, the court sustained the petition as to J.C., declared the minor dependent, and ordered that petitioner receive reunification services as well as two supervised visits per month with J.C. The objectives of petitioner's reunification case plan were that he stay drug free and comply with drug tests, obtain and maintain a stable and suitable residence for himself and J.C., and stay sober and show the ability to live free from alcohol dependency. The case plan also called for petitioner to complete both individual and family counseling, as well as a parenting class.

### *Six-month Review*

A six-month status review hearing was held on June 19, 2013. The status report related the Bureau had no contact with mother and that J.C. and his two half-siblings were currently placed together in a licensed foster home. J.C. "shared that he talked with

2

his mother [by telephone]. He misses his mother. He does accept the love and nurturing readily available in the home and this helps him with the sadness over his mother's disappearance."

The report also related petitioner was actively engaged in his family reunification plan and wanted to reunify with J.C. Petitioner successfully graduated from the Discovery House inpatient drug and alcohol treatment program and attends "12 Step Meetings several times a week and is working on the 12 Steps." He participated in random drug testing and all tests were negative. Also, he completed a parenting education class with Rubicon Programs and was actively involved with a fatherhood coach.

The six-month status review report also related petitioner had two, one-hour supervised visits with J.C. per month. Petitioner arrived on time, was prepared to spend the hour playing with J.C., and brought toys and sweets for him. J.C. enjoyed his visits with petitioner and the two "are re-establishing what their contact and time with each other is like."

Regarding the prognosis for returning J.C. to petitioner's custody, the report stated "additional time is needed to give [petitioner] an opportunity to experience life without the use of alcohol for a longer period of time before the challenges of parenting full time are presented." Although petitioner had done well in recovery, he had spent the majority of his adult life as an active alcoholic and sobriety was new to him. J.C. experienced his father as a "drunk" and petitioner had yet to explore and take responsibility for his role in creating the chaos and instability the children experienced prior to placement.

### 12-month Review

A 12-month review hearing was held on November 4, 2013. In the status report, the Bureau social worker reported petitioner was "working very hard on his sobriety and Family Reunification Plan." Further, petitioner was employed full time as a cook at a convalescent hospital, continued to reside in a Sober Living Home and was an active member of Alcoholics Anonymous. He was attempting to secure independent housing through Shelter Inc. and Rubicon. Visits between petitioner and J.C. were unsupervised

3

and were going well. According to the social worker, the "next logical step for [petitioner] is to increase his therapeutic involvement. In discussions with this worker, [petitioner] does not acknowledge, understand or contemplate how parenting as an alcoholic affected [the minor]. [J.C.]'s siblings share that [petitioner] was overly rough with [J.C.] in his disciplining and was inappropriate with their adult half-sister, and overall, when intoxicated, not easy to be around. . . . With this in mind, a referral for individual and family therapy is being submitted and included as part of his Family Reunification Case Plan." The social worker recommended continued reunification services to petitioner with the goal of him reunifying with J.C. and assuming custody of the minor.[2] Following the hearing, the court adopted the Bureau's recommendation, continued petitioner's reunification services and increased his visitation with J.C. to one hour, four times per month.

### 18-month Review

A contested 18-month review hearing was held on May 1, 2014. The Bureau no longer supported reunification and instead recommended that the court terminate reunification services and set a section 366.26 hearing to determine a permanent plan for J.C. In the status report, the social worker related that since November 2013, when petitioner transitioned to an independent living arrangement, "he has experienced numerous obstacles surrounding his compliance" with the case plan designed to effect his reunification with J.C.

In this regard, the social worker reported petitioner failed to appear at two drug testing appointments and another test was diluted. Also, petitioner had not had consistent and regular visitation with his son, failed to initiate monthly contact meetings with the

---

[2] As for the remainder of J.C.'s family, the Bureau reported mother had again disappeared, had not complied with her reunification plan or used the Bureau to maintain contact with the children, and recommended termination of her reunification services. J.C.'s two older half-siblings, as well as J.C., are thriving in the home of the current caregiver; the social worker recommended setting a section 366.26 hearing to implement a permanent plan of guardianship by the current caregiver for J.C.'s two older half-siblings, noting that if petitioner cannot reunify with J.C., "we will be seeking Guardianship in this home for him, as well."

4

social worker to review the case progress and failed to appear for scheduled meetings with the social worker. In addition, petitioner had failed to engage in individual counseling or in therapeutic counseling with J.C., as required under the case plan. Moreover, petitioner had struggled to maintain a clean and safe living environment due to his poor insight in allowing mother, a known alcohol abuser, to reside in his home overnight.

Regarding petitioner's contact with mother, the social worker reported that after J.C. returned from a visit with petitioner on February 22, 2014, he told the social worker that his mother was at petitioner's home for the duration of his visit. This was the first time J.C. had seen his mother in over a year. J.C. said he was sent to his room to give his parents time alone and that he was taken back to the drop-off location by a man he had never met before. Upon receiving this information from J.C., the social worker contacted petitioner to inform him that mother's presence violated the conditions of mother's visitation order.

Thereafter, the social worker made an unannounced visit at petitioner's residence on March 13; petitioner was reluctant to let the social worker in because he "had a lady friend over." Petitioner then admitted the "lady friend" was J.C.'s mother, and she had stayed the night with him because he "needed a booty call." The social worker explained mother's presence in his home was a direct threat to his sobriety due to her history of alcohol abuse and failure to engage in services. Upon entry to petitioner's home, the social worker found two empty vodka bottles; mother claimed she drank both bottles herself and petitioner denied drinking any of the vodka. The social worker told petitioner his visitation with J.C. would henceforth revert to supervised visitation. Petitioner could not understand why his association with mother placed his sobriety in jeopardy and was "agitated and frustrated upon hearing" future visitation would be supervised.

At the contested hearing, social worker Amber Sanner testified on cross-examination that she had concerns over petitioner's sobriety due to the vodka bottles she found in his home on March 13, 2014. Sanner confirmed petitioner completed a negative

drug test on that day and had "never tested dirty during this review period." She also confirmed J.C. has never indicated he does not want to visit with his father, and in the visits between the two she had observed, the interactions were "appropriate." On redirect examination, Sanner testified petitioner had visited J.C. about five times in the last six months. However, after these visits J.C. reported he had spent his time engaged in video games or playing on his phone and had little interaction with his father. Also, he reported he was not fed and often went home hungry.

Petitioner testified J.C. enjoyed their visits together and always smiled happily when petitioner picked him up. Further, petitioner testified he drug tests every week, attends Alcoholics Anonymous meetings three times a week, and lives in a two-bedroom apartment in Martinez. One bedroom is for J.C. and it is furnished with a bed, TV, and nightstand. Petitioner stated if J.C. was placed with him he would be willing to comply with any conditions the court set, such as having regular meetings with the social worker and not having mother at his apartment. Petitioner testified he had "no relationship" with mother; she called one night and said she had no place to go, and because he felt sorry for her he let her spend the night. Petitioner asserted "nobody told me she can [not] come over . . . when my son is there," but acknowledged he "made a mistake" and now understands she's not supposed to be in his home.

After the matter was submitted, the court found petitioner's attitude and assertions regarding his relationship with mother to be "incredible and not believable, given the whole history of this case and these proceedings and the discussions that have been carried on in this courtroom and in the reports. Dad gets copies of all these reports. And in every single report with respect to visitation it's noted that mother's contact with the child has been limited by court order. And dad has knowingly violated that court order. And, quite frankly, even if he weren't aware of that order, that he lacks the understanding of how inappropriate it is to have [mother] in her state around [J.C.] It is concerning to the Court that dad would make such poor decisions, and it demonstrates a real lack of insight on his part and acknowledgement that she is a real threat to safety and well-being of this child, both physically and emotionally. There is an emotional component to all of

this that dad seems not to understand. And I find his claim that he didn't know before the, quote/unquote, booty call date that he shouldn't have mom in the home to be incredible."

The court also found it "disturbing" that the vodka bottles were found in petitioner's home, noting it was "substance abuse that gave rise to this case in the first place" and "in many respects we're almost right back where we began, which is a real shame." The court further noted petitioner "has not maintained regular visitation with the child during this reporting period" and that petitioner put his own needs for a sexual relationship with mother before the needs of the minor. In sum, the court found "by clear and convincing evidence that return of the child to the custody of his father would create a substantial risk of detriment to the child's safety, protection, physical and emotional well-being." The court adopted the recommendations set forth in the status report and set a section 366.26 hearing for August 25, 2014.

## DISCUSSION

The trial court found that it would create a substantial risk of detriment to J.C. if he was returned to petitioner's custody. (See § 366.22, subd. (a) [child must be returned to the physical custody of parent at the 18-month permanency hearing "unless the court finds, by a preponderance of the evidence, that the return of the child . . . would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child"].) Petitioner contends the trial court's finding lacks substantial evidence, asserting the record shows he successfully completed parenting and domestic violence prevention classes, as well as a residential substance abuse program, obtained full-time employment and secured suitable housing. Additionally, petitioner points out he also provided clean drug tests and regularly attends Narcotics Anonymous and Alcoholics Anonymous meetings.

We review the juvenile court's detriment finding for substantial evidence. (See *In re Yvonne W.* (2008) 165 Cal.App.4th 1394, 1400–1401.) "We do not evaluate the credibility of witnesses, reweigh the evidence, or resolve evidentiary conflicts. Rather, we draw all reasonable inferences in support of the findings, consider the record most

7

favorably to the juvenile court's order, and affirm the order if supported by substantial evidence even if other evidence supports a contrary conclusion." (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947; see also *Constance K. v. Superior Court* (1998) 61 Cal.App.4th 689, 705 ["In the presence of substantial evidence, appellate justices are without the power to reweigh conflicting evidence and alter a dependency court determination."].) On appeal, the parent has the burden of showing that there is no evidence of a sufficiently substantial nature to support the court's finding. (*In re L.Y.L., supra*, at p. 947.) Under these standards, we cannot simply credit petitioner's achievements and ignore other substantial evidence in the record that supports the court's finding of detriment.

In this regard, despite petitioner's progress in the first 12 months of the reunification process, the record shows his progress towards reunification stalled around the time he transitioned to an independent living arrangement in November 2013. Of particular note, at the 12-month review stage the social worker opined that the "next logical step" for petitioner was to "increase his therapeutic involvement" because he fails to "acknowledge, understand, or contemplate how parenting as an alcoholic affected" J.C. As a consequence, the court adopted the Bureau's recommendation to refer petitioner for individual and family therapy and included it as part of his family reunification plan.

However, between the 12-month and 18-month hearings, petitioner failed to engage in the therapeutic counseling services deemed necessary for his understanding of the impact his alcoholic parenting had on J.C. And the need for such counseling was clearly demonstrated by petitioner's serious lack of judgment in resuming his relationship with mother, an untreated and continuing alcoholic who had failed to engage in any services to address her alcohol problem. Moreover, petitioner continued his relationship with mother even after the social worker admonished him it was inappropriate to do so because it posed a threat to his continued sobriety. The social worker's concern was amply borne out by the fact that on her unannounced visit to petitioner's residence she discovered mother had stayed there overnight and consumed two bottles of vodka.

Furthermore, petitioner jeopardized J.C.'s physical and emotional well-being by having mother present at his residence during a visit by J.C. at a time when the child had not seen his mother for over a year and the court had specifically ordered mother was not to have visitation with him. Additionally, J.C. said he was sent to his room to give his parents time alone and that he was taken back to the drop-off location by a man he had never met before, further evidencing petitioner was more concerned with his own gratification than the emotional needs of his son. On top of all this, petitioner failed to establish weekly visits with his son as permitted by the court after the 12-month review hearing; in fact petitioner visited J.C. only five times in the six months preceding the 18-month review hearing, and the quality of care provided by petitioner at such times was poor, as shown by the minor's reports that he had little interaction with his father, spent his time engaged in video games, was not properly fed and often went home hungry.

In sum, the record reflects substantial evidence in support of the trial court's finding that returning J.C. to petitioner's care would "create a substantial risk of detriment to safety, protection, or physical or emotional well-being of the child." (§ 366.22, subd. (a).) Accordingly, in the face of such substantial evidence, we may not disturb the dependency court's determination. (See *Constance K. v. Superior Court, supra,* 61 Cal.App.4th at p. 705.)

Petitioner also contends the juvenile court erred in finding the minor could not be returned to him with additional reunification services. Section 366.22, subdivision (b) gives the juvenile court discretion to extend the service period beyond the 18-month review if it "determines by clear and convincing evidence that the best interests of the child would be met by the provision of additional reunification services to a parent . . . who is making significant and consistent progress in a substance abuse treatment program," and if the court finds "all of the following: (1) That the parent or legal guardian has consistently and regularly contacted and visited with the child. (2) That the parent or legal guardian has made significant and consistent progress in the prior 18 months in resolving problems that led to the child's removal from the home. (3) The parent or legal guardian has demonstrated the capacity and ability both to complete the

objectives of his or her substance abuse treatment plan . . . and to provide for the child's safety, protection, physical and emotional well-being, and special needs." (*Ibid.*)  Here, evidence showing petitioner's inconsistent contact and visitation with the minor in the six months preceding 18-month review, his lack of engagement in therapeutic counseling, his resumption of a relationship with the minor's alcoholic mother, and his failure to properly care for and nurture J.C. during visits, amply supports the conclusion that additional reunification services were not in the minor's best interests.

### DISPOSITION

The petition for extraordinary writ is denied on the merits.  (See Cal. Const., art. VI, § 14; *Kowis v. Howard* (1992) 3 Cal.4th 888, 894; *Bay Development, Ltd. v. Superior Court* (1990) 50 Cal.3d 1012, 1024.)  The decision is final in this court immediately.  (See Cal. Rules of Court, rules 8.452(i), 8.490(b)(2)(A).)


_____
Becton, J.[*]


We concur:


_____
Margulies, Acting P.J.

_____
Banke, J.


---

[*] Judge of the Contra Costa County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.


10