Filed 12/15/14  Vanessa S. v. Superior Court CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FIFTH APPELLATE DISTRICT

| | |
|---|---|
| VANESSA S., | F070095 |
| Petitioner, | (Super. Ct. Nos. 13CEJ300188-1, 2, and 3) |
| v. | |
| THE SUPERIOR COURT OF FRESNO COUNTY, | **OPINION** |
| Respondent; | |
| FRESNO COUNTY DEPARTMENT OF SOCIAL SERVICES, | |
| Real Party in Interest. | |

## THE COURT[*]

ORIGINAL PROCEEDING; petition for extraordinary writ.  Brian M. Arax, Judge.

Elizabeth Diaz, Public Defender, and Cheryl Kay Turner, Deputy Public Defender, for Petitioner.

No appearance for Respondent.

Daniel C. Cederborg, County Counsel, and Amy K. Cobb, Deputy County Counsel, for Real Party in Interest.

-ooOoo-

---

[*]Before Cornell, Acting P.J., Kane, J. and Franson, J.

Vanessa S. (mother) seeks extraordinary writ review of the juvenile court's order terminating her reunification services as to three of her children: Hector J. (currently age 5), Lucy L. (currently age 3), and Sav. Y.[1] (currently age 1), pursuant to Welfare and Institutions Code[2] section 366.21, subdivision (h) and setting a section 366.26 hearing. She contends the juvenile court failed to consider the entirety of her progress in making its decision to terminate reunification services, and the court's finding there was no substantial probability the children would be returned to her care by the 18-month review date was not supported by the evidence. We find no error and deny the petition.

## PROCEDURAL AND FACTUAL SUMMARY

In August of 2009, mother tested positive for methamphetamine at the time of Hector J.'s birth. She had admitted to using methamphetamine a few days prior to her child's birth and had received poor prenatal care. Mother agreed to participate in voluntary family maintenance services, including a six-month inpatient drug treatment program she completed in May of the following year. Her case was ultimately closed in September of 2010 as the family had stabilized.

Despite the previous services, mother again tested positive for methamphetamine use in June 2013 at the time she gave birth to her youngest child, Sav. Y. Mother admitted to using methamphetamine just days before Sav.'s birth and there was further evidence mother had tested positive for methamphetamine in March of 2013. The following day, the Fresno County Department of Social Services (the Department) removed the children from mother's custody and subsequently filed a petition pursuant to section 300, subdivision (b). The petition alleged there was a serious risk that Hector J.,

---

[1]We note the record refers to this child as Sab. We use the name provided by the petitioner.

[2]All further references are to the Welfare and Institutions Code unless otherwise indicated.

2.

Lucy L., and Sav. Y. would suffer serious physical harm as a result of mother's failure to provide care to the children due to her substance abuse.[3]

The trial court detained the children and placed them under the care of the Department, removing them from mother's custody. Additionally, the court ordered the Department to provide mother with services, including parenting classes, substance abuse evaluation and treatment, random drug testing, and a mental health evaluation.

Mother initially entered an inpatient drug treatment program at WestCare on July 10, 2013. According to the Department report, mother "would make good progress and then regress dramatically." On November 10, 2013, after her counselor expressed concerns about her fraternization with a male resident, James L., mother self-discharged from the program.[4] She claimed she left the program because she was feeling overwhelmed and felt she was being judged by her counselor. Although mother had been visiting regularly with her children since July, she stopped visiting the children after leaving her inpatient treatment and did not resume visitation until January 29, 2014.[5] Mother also discontinued her random drug testing during that time.

On January 14, at the dispositional hearing, the court found mother's progress was minimal in alleviating the circumstances necessitating removal of her children. The trial court ordered reunification services for mother, including parenting classes, substance abuse treatment, a mental health evaluation, and drug testing. A six-month review hearing was scheduled for July 26.

Mother reentered her inpatient drug treatment on April 3 and resumed drug testing at that time, testing positive for drug use on that date. Her subsequent drug tests leading

---

[3]No petition was filed regarding mother's other children Jesus R., Juan R., and Junior R. as they were residing with other family members at the time.

[4]Mother denied leaving the program because James L. had completed his treatment and was discharged from the program, which occurred at approximately the same time she left the program.

[5]All further references to dates are to 2014 unless otherwise indicated.

up to her six- and 12-month reviews were negative. She also resumed visitation with her children on January 29, ultimately progressing to unsupervised visits with her children. By all accounts, mother was "attentive, affectionate, and engag[ing] with her children" during visitation.

During the next several months, mother completed a parenting program, completed the inpatient portion of her residential treatment program, and participated in a mental health assessment, where it was recommended she engage in individual therapy. Due to several factors not relating to mother, the six-month review, which had originally been scheduled for July, was continued several times. Due to the passage of time, the matter was set for a combined six- and 12-month review. According to the social worker's report, mother had made moderate progress in her reunification services; however, she had not demonstrated her ability to remain sober for a long period of time in an unstructured environment. Therefore, the department recommended terminating reunification services. The matter was set for a contested hearing that was heard on September 16.

At the hearing, mother testified she completed a mental health assessment in the months prior to the hearing. According to the Department addendum report dated August 19, the assessment revealed mother had a long history of substance abuse and chronic domestic violence victimization, poor insight, and a history of abandonment and neglect. These issues had never been addressed. Mother received a recommendation to participate in individual therapy to address these issues. She testified she had been engaging in weekly therapy sessions.

At the time of the hearing, mother was eight months pregnant with her seventh child. She testified she did not realize she was pregnant until she reentered WestCare in April. The father of that child is James L. Mother was living in a sober living home and was seeking independent housing. She testified she had taken the necessary steps for housing but had not yet received a voucher for State-assisted living as of that time.

4.

According to the Department reports, mother began using methamphetamine when she was 18 years old. When mother was initially interviewed after giving birth to Sav., she reported she had begun using methamphetamine because she was stressed and felt her husband was going to leave her. She admitted she again began using methamphetamine twice a week in March of 2013.

When questioned regarding her decision to leave her inpatient drug program without completion in November of 2013, mother stated she left the program because she "felt like [she] could do it on [her] own and do outpatient." She noted James L. was in the WestCare program at the same time and he completed his program in November. She admitted she never signed up for outpatient care and relapsed into drug use. She testified James L. helped her with transportation to her visits and her subsequent reenrollment in WestCare. During the time she had initially left the drug program, mother claimed she remained drug-free until February or March. She denied James L. was using narcotics with her.

Mother reentered the inpatient drug program in April and completed the program. She had not yet completed the outpatient portion as she had asked for more intensive treatment on her own. According to the social worker's report, mother requested the additional treatment because she wanted more support. She explained that when she entered the program, she felt she had more support than her previous entries into drug rehabilitation. She had continuously drug tested since April of 2014, receiving negative tests.

Mother explained that at the time of the hearing, James L. was also currently attending an inpatient drug program at WestCare. According to the social worker's report, James L. reentered treatment due to a parole violation. Mother testified James L. was attempting to better himself by voluntarily attending domestic violence classes. He was attempting to "prove … himself" to the court and mother. Mother claimed she would put her children before her relationship, although James L. would be a part of her unborn child's life.

When asked about James L.'s criminal history, mother noted she was aware of his history, including a conviction for involuntary manslaughter where he served 10 years in prison. She also learned of a prior domestic violence charge in 1997, but claimed it had been dropped, that James L. had not struck the victim, and he had not mentioned it earlier because he did not know it was going to come up.

Regarding visitation with her children, mother testified she progressed to unsupervised visits in June, and at the time of the hearing she was engaging in two 8-hour visits per week. She testified that because one of her children attended school, she could not have overnight visits. This testimony was contradicted by her social worker Ashleigh LaBoy, who explained mother had not begun overnight visits because she appeared overwhelmed after spending a period of time with her children. The house manager at the sober living home had informed LaBoy that mother was not able to keep up with the children, and given the late stage of her pregnancy, it did not appear she could handle longer visits.

Two of mother's detained children have developmental delays. In explaining the delays, mother noted Lucy was a child who liked "to get into things," but she was only two years old and "[o]f course she's getting into things and running around and experiencing. She's a child. That's what kids do. I just got to be on her." Her other child, Sav., is "curious." When asked if it was more difficult to parent children with developmental delays, mother stated it was not, noting her children were two and one years old.

When asked if she would have support or help with her children if she regained custody, mother responded her 19-year-old niece could help her as well as others from the sober living home. Mother opined she would not have any problems if her children were placed with her. She would not need any help with the children in independent housing because the children would not get into other people's belongings, which was the only problem she had with her children. She testified she would not have any difficulty managing three small children on her own. She noted she generally had her children with

6.

her at the sober living home where there are others present, but there have been times when she has had five of her children on her own while doing various tasks.

When asked how having a newborn would impact her ability to care for the three children who had been detained, she replied it would not "affect me at all." She noted she currently had six children, and she was capable of caring for all for them and meeting their needs.

Mother acknowledged she had participated in voluntary family maintenance with the Department in 2009 and she closed the case "with flying colors" but later had a relapse. She felt her situation was different now because her children had been removed from her care and she realized she could lose them if she were to relapse again. She regretted not being there for her children and "getting them yanked from my arms." She testified she understood that backsliding was not an option.

Regarding her support system, she noted she went to Narcotics Anonymous meetings and she was able to receive support from the meetings as well as attending weekly therapy sessions.

The Department called LaBoy to testify. LaBoy testified she had concerns mother would be able to handle the three children on her own. LaBoy had observed mother with the children and noted she appeared to be overwhelmed with having to chase after Lucy, whom she characterized as "very active" and requiring "a lot of attention." She explained mother's visits with her children were shortened because mother had become very tired during the visits due to her pregnancy. LaBoy was concerned that with a newborn, mother would not be able to give the children the attention they need.

Additionally, she had concerns about James L. Specifically, she noted that when he was initially interviewed he minimized his criminal history, just noting a minor drug charge. She later learned he had a felony domestic violence conviction, a voluntary manslaughter conviction for which he was sentenced to 11 years, and a drug charge in 2013. Furthermore, she explained he had raised his voice during the meeting and become quite upset when they discussed his criminal history. She noted James L. did most of the

talking in the last two meetings she had with him and mother. Although she had concerns about him, LaBoy could not say it rose to the level where she could say he should be taken into account as a factor relating to the substantial probably of the return of the children.[6]

Regarding mother's sobriety, LaBoy noted mother had been unable to demonstrate she could remain sober for an extended period of time. She did not feel the children could be safely returned to mother's care by December 20, which would be the 18-month date. This is because mother had not yet been able to demonstrate the ability to remain sober outside of a structured environment.

After considering the testimony of the witnesses and the social worker's report, the juvenile court found mother had not made sufficient progress to allow the children's safe return to her custody. The court concluded mother's progress was moderate, and the return of the children would create a substantial risk of detriment to their well-being. The court further found the Department had provided reasonable reunification services and had demonstrated there was no substantial probability the children could be returned to mother and safely maintained within the home. As a result, the court terminated reunification services and set the matter for a section 366.26 hearing.

## DISCUSSION

In her petition, mother makes three separate yet related claims. First, she argues the juvenile court did not take the entire time period into account in making its ruling. Next, she claims the court's findings that she made only moderate progress and there was no substantial probability the children could be returned to her custody were not supported by the evidence; therefore, the juvenile court abused its discretion in terminating reunification services. Finally, she contends the juvenile court erred in taking into account James L.'s criminal history. We find no error.

---

[6]The court expressly gave this testimony minimal weight.

**A.      The Trial Court Considered the Entire Time Period in Making Its Findings**

Mother argues the juvenile court failed to take the entire time period into account in determining there was no substantial probability the children would be returned to her custody prior to the permanency planning hearing. In essence, she contends the juvenile court miscalculated the six-month review date, and had the court properly calculated that date and taken her progress to that date into account, it would have concluded she was making substantial progress and continued the case for another review hearing. A thorough review of the juvenile court's decision demonstrates mother's claim is without merit.

Contrary to mother's claim otherwise, the record demonstrates the juvenile court considered the totality of the circumstances of her progress until the time of the hearing in September in making its findings. In its ruling, the juvenile court noted that because the sibling group contained children under the age of three, mother was presumptively limited to six months of services. (§§ 361.5, subd. (a)(2), 366.21, subd. (e); *Tonya M. v. Superior Court* (2007) 42 Cal.4th 836, 843.) The court explained because mother was just "coming out of the [throes] of her" addiction in April, she would not have been entitled to continue to the 12-month review stage had the six-month review been timely held. Seizing upon that language, mother argues the six-month review period did not expire until July, and had the juvenile court considered mother's progress to July it would not have terminated reunification services. We need not decide when the six-month review period expired because it is clear from the trial court's ruling that the court in fact considered mother's progress up to the time of the hearing in September.

Whether mother would have been entitled to progress to a 12-month review had a six-month review been timely held in this case is of little relevance as she was actually provided services up to and beyond the 12-month date by virtue of the delays in the case. The juvenile court acknowledged as much, explaining mother had been "continued to the twelve-month stage de facto not by law and, in fact, we're a month late on the twelve months." Pursuant to section 366.21, subdivision (f), the juvenile court is required to

9.

hold a permanency planning hearing no later than 12 months after a child enters foster care.

Pursuant to section 361.49, a child is deemed to have entered foster care either at the date of the jurisdictional hearing or 60 days after the date of the child's removal, whichever occurs first. The trial court held the jurisdictional hearing on October 22, 2013, but the children were removed from mother's custody on June 20, 2013. Therefore, they are deemed to have entered foster care on August 19, 2013. Pursuant to section 361.5, subdivision (a)(1)(B) and (C), when a child is under the age of three, or part of a sibling group where one of the siblings is under the age of three at the time of removal, court-ordered services shall be provided for no longer than 12 months from the date the child enters foster care, unless the child is returned to the parent's home. Thus, the 12-month date elapsed on August 19, 2014. However, the hearing on mother's progress was not held until September 16.

The court explained, "mother has been give the benefit of additional time to reunify" and the court noted it must consider the evidence "in light of that showing today." In its ruling, the court considered in detail all of mother's progress up to the hearing date. Specifically, she had completed her inpatient program and complied with the outpatient requirements. In addition, she had visited appropriately with her children with the exception of the period between November and January as mentioned above. She had tested negative for drug use for five months, and the court found her testimony moving regarding her love and commitment toward her children and her regret regarding having her newborn removed from her custody. As the record refutes mother's claim that the juvenile court did not consider the totality of her progress, her claim fails.

## B.    Substantial Evidence Supports the Juvenile Court's Findings

In a closely related argument, mother contends the trial court erred in failing to continue the case for a permanency review hearing as the evidence supported a finding she had made significant progress in her services, and there was a substantial probability

10.

the children would be returned to her custody and safely maintained in the home. We disagree.

Pursuant to section 366.21, subdivision (f), a permanency planning hearing shall be held "no later than 12 months after" the children entered foster care. At that hearing, the court shall "return … the child to … his or her parent … unless the court finds, by a preponderance of the evidence, that the return of the child to his or her parent … would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." The Department bears the burden of establishing the detriment. The juvenile court is required to determine whether reasonable services were provided to the parent at that hearing. (§ 366.21, subd. (f).)

Where, as here, the time period of the court-ordered services has exceeded 12 months, the court may either, as applicable here, (1) continue the case for up to six months for a permanency planning as long as the hearing occurs within 18 months of the original removal of the children, or (2) order a hearing in accordance with section 366.26 be heard within 120 days. (§ 366.21, subd. (g)(1), (4).) In order to continue the case for a permanency review, the court must find a "substantial probability that the child will be returned to the physical custody of his or her parent … and safely maintained in the home within the extended period of time." (§ 366.21, subd. (g)(1).) This standard is met where the court finds: (1) the parent has consistently and regularly contacted and visited the child; (2) the parent has made "significant progress in resolving problems that led to the child's removal from the home," and (3) the parent "has demonstrated the capacity and ability both to complete the objectives of … her treatment plan and to provide for the child's safety, protection, physical and emotional well-being, and special needs." (§ 366.21, subd. (g)(1)(A)-(C).)

We review the juvenile court's findings to determine if they are supported by substantial evidence. (*In re Shaundra L.* (1995) 33 Cal.App.4th 303, 316.) Substantial evidence is "reasonable, credible evidence of solid value such that a reasonable trier of fact could make the findings challenged." (*In re Brian M.* (2000) 82 Cal.App.4th 1398,

11.

1401.)  "We must resolve all conflicts in support of the determination, and indulge in all legitimate inferences to uphold the court's order.  Additionally, we may not substitute our deductions for those of the trier of fact." (*Elijah R. v. Superior Court* (1998) 66 Cal.App.4th 965, 969.)

Mother claims the juvenile court's finding that her progress was moderate was unsupported by the evidence.  In addition, mother contends the juvenile court's finding there was no substantial probability of return is unsupported as the evidence demonstrated she had consistently visited the children, made significant progress in resolving the problems that led to the children's removal, and she demonstrated the capacity and ability to complete the objectives of her treatment plan and to provide for the children's safety, protection, and their physical, emotional and special needs. (§ 366.21, subd. (g)(1)(A)-(C).)  A review of the record reveals ample support for the juvenile court's findings.

Despite mother's progress in her services, the record confirmed she had not demonstrated her ability to remain sober and provide for her children's safety and needs. On this point, mother's history is important.  Mother has struggled with her methamphetamine addiction for approximately 10 years.  In 2009, when Hector was born, she tested positive for methamphetamine.  She engaged in voluntary family maintenance services, but despite the fact she had completed a residential treatment program in 2010 and was given structured support until the end of the year, she relapsed and again tested positive for methamphetamine at the time of Sav.'s birth.  Mother admitted she had begun using methamphetamine in the months prior to Sav.'s birth.  At the time of his birth, she noted she had begun using methamphetamine because she felt her husband was going to leave her and she became "stressed."

Mother entered another residential drug treatment program after Sav.'s birth, but chose to leave the program after only a few months.  She did not reenter that program until April and tested positive for methamphetamine at that time.  Mother was pregnant with her seventh child at the time, demonstrating she had again begun using drugs while

12.

pregnant despite being involved in reunification services. As the court found, this history is significant in that it demonstrates mother's inability to place her children ahead of her addiction. Although she had made progress since entering her third inpatient substance abuse program in April, she had not been able to progress to an independent living arrangement by the time of the hearing. Due to the fact mother had resisted services until April, mother was unable to progress to living in an independent and unstructured environment. As such, there was no evidence mother could remain sober in such an environment.

Furthermore, the stated reason for mother's prior release into drug use was stress. At the time of the hearing mother was attempting to regain custody of her three small children while eight months pregnant. She would be required to care for them on her own along with a newborn in an unstructured environment. LaBoy testified mother appeared overwhelmed when caring for her children for extended visits and while in a structured environment with others there to help her. Given this evidence, it is apparent mother was facing at least as much stress as she had faced at the time of her two prior relapses. Furthermore, mother did not seem to appreciate the impact of having to care for three small children, two of whom had developmental delays, while also caring for a newborn. She testified she would have no problem in caring for the children on her own and without structured support, and the addition of a newborn would not cause her any stress. The court found this testimony "astounding." Nor did mother seem to appreciate the level of care required for her children with developmental delays, noting they were just kids. This stood in contrast to LaBoy's testimony that Lucy required a significant amount of attention. Moreover, according her mental health evaluation, mother demonstrated poor insight into her issues regarding drug abuse and chronic victimization. Additionally mother did not complete her mental health assessment until late June, over a year after her children were initially removed. This provided her with little time to begin addressing her issues regarding her substance abuse and victimization. This evidence supported the juvenile court's finding that mother's progress was only moderate.

13.

Mother further argues the court erred in determining there was no substantial probability of her children's return by the 18-month date. This argument relies solely upon the fact that she had completed most of her services by the time of the review hearing. But completing some of the conditions of a reunification service plan does not constitute significant progress in resolving the problems that led to the child's removal, or substantial compliance with the objectives of the reunification plan for purposes of extending reunification services beyond 12 months. Just as a parent's failure to meet all the reunification requirements is prima facie evidence that return of the minor to the parent would be detrimental (§ 366.21, subd. (f)), technical compliance with portions of a reunification plan does not automatically result in a substantial probability the child will be returned to the physical custody of the parent and safely maintained in the home within the extended period of time. A court must consider the parent's capacity to meet the objectives of the plan and the progress the parent has made toward eliminating the conditions prompting the dependency. (See *Constance K. v. Superior Court* (1998) 61 Cal.App.4th 689, 705-708; *In re Dustin R.* (1997) 54 Cal.App.4th 1131, 1143; *In re Joseph B.* (1996) 42 Cal.App.4th 890, 900-901.) In cases such as this, where substance abuse is a central issue, the juvenile court has the duty "to evaluate the likelihood that [a parent] would be able to maintain a stable, sober and noncriminal lifestyle for the remainder of [the minor's] childhood." (*In re Brian R.* (1991) 2 Cal.App.4th 904, 918.)

Mother's progress, while laudable, was not sufficient to demonstrate she had the capacity to safely maintain her children and meet their needs without relapsing into drug abuse. Pursuant to section 366.21, subdivision (g)(1), mother must not only make significant progress in resolving the problems that led to her children's removal, but also demonstrate the capacity to complete her treatment plan and provide for her children's safety, well-being, and special needs. Despite the fact services were available to mother for over a year from the time her children were removed from her custody, she was unable to progress to the point where she was living independently and maintaining her sobriety in an unstructured environment. This was due largely to the fact she had not

14.

begun to participate in her programs until April, some nine months after the removal of her children. Despite her progress in the program, she had not begun overnight visitation with her children due to the fact she became overwhelmed with parenting during the course of a day. The fact that the evidence established mother had a pattern of relapsing into drug use when she became overwhelmed did not bode well for her situation. This was compounded by the fact mother was eight months pregnant at the time of the hearing. Furthermore, mother's statement she would have no difficulty parenting three small children, two of whom had developmental delays, while also caring for a newborn suggests she still lacked awareness into her situation. This evidence supported the juvenile court's order there was no substantial probability the children would be returned to her prior to a permanency review. Pursuant to section 366.21, subdivision (g)(1), the court may only continue the matter for an additional permanency planning review if it finds a substantial probability of the children's return by the 18-month date. As we have explained, the juvenile court's order of no substantial probability of return was supported by the evidence. Thus, pursuant to section 366.21, subdivision (g)(4), the court ordered a hearing pursuant to section 366.26. Given the court's findings as explained above, the setting of the hearing was not an abuse of discretion.

## C. The Findings Relating to James L. Were Supported by the Evidence

Finally mother contends the juvenile court erred in considering evidence relating to James L.'s criminal history, as no evidence of his criminal history other than "generalized terms used for criminal offenses" was presented to the court. Mother notes she testified that James L. suffered a prior conviction for "involuntary manslaughter"[7] while LaBoy testified she had knowledge he had previously been convicted of "manslaughter" and served an 11-year prison term. She argues involuntary manslaughter is not the same as voluntary manslaughter and the court erred in taking this history into account. We find mother's arguments unpersuasive.

---

[7]Mother testified James L. had served a 10-year prison term for this offense.

15.

Initially, we note there was testimony from both mother and LaBoy regarding James L.'s criminal history.  Although no one recited any code sections, LaBoy testified James suffered a conviction for "manslaughter" and served a prison term of 11 years.  There was no objection to this evidence.  Therefore, evidence was in fact presented regarding his criminal history.  Furthermore, according to the evidence, it appears James L. suffered the conviction for voluntary manslaughter based on the length of the sentence.[8]  Thus, it appears the juvenile court's findings relating to James L.'s criminal history were justified.

Moreover, the court expressly stated it gave the findings "minimal weight" and also specifically found it would have made the same decision even without considering evidence related to James L.  While the evidence related to James L. further supports the juvenile court's finding that mother continued to engage in poor decision making, it was not necessary to the court's finding.  Indeed, as we have already explained, the juvenile court's decision was supported by the evidence independent of any reasons relating to James L.  Furthermore, the juvenile court expressly stated it would have reached the same result without taking into account evidence relating to James L.  Thus, even if we were to agree with mother's contention that there was no evidence of his criminal history, she could not have suffered prejudice.  Consequently, her claim must fail.

## DISPOSITION

The petition for extraordinary writ is denied.  This opinion is immediately final as to this court.

---

[8]Pursuant to Penal Code section 193, voluntary manslaughter is punishable by imprisonment in the state prison for three, six, or 11 years, while involuntary manslaughter is only punishable by a term of two, three, or four years.  (Pen. Code, § 193, subds. (a), (b).)