Filed 3/22/21  Gloria I. v. Superior Court CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| GLORIA I., | B308024 |
| Petitioner, | (Los Angeles County Super. Ct. No. 18CCJP02858A-B) |
| v. | |
| THE SUPERIOR COURT OF LOS ANGELES COUNTY, | |
| Respondent; | |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Real Party in Interest. | |

ORIGINAL PROCEEDING.  Petition for extraordinary writ.  (Cal. Rules of Court, rule 8.452.)  Debra Archuleta, Judge. Petition denied.

Los Angeles Dependency Lawyers, Inc., Law Office of Martin Lee, Bernadette Reyes and Brittany Boyle for Petitioner.

No appearance for Respondent.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, and Melania Vartanian, Deputy County Counsel, for Real Party in Interest.

* * * * * * * * * * *

Petitioner Gloria I. is the mother of now 13-year-old A.I. and eight-year-old I.M., both dependents of the juvenile court. On September 29, 2020, the juvenile court terminated reunification services and set a selection and implementation hearing under Welfare and Institutions Code section 366.26.[1] Mother filed a petition for extraordinary writ pursuant to rule 8.452 of the California Rules of Court challenging the order, arguing there was not substantial evidence it would be detrimental to return the children to her care. We deny the petition, finding substantial evidence supports the juvenile court's order.

**FACTUAL AND PROCEDURAL BACKGROUND**

This family came to the attention of the Los Angeles County Department of Children and Family Services in February 2018, following a referral that mother's husband, R.M. (and the father of I.M.) had been placed on an involuntary psychiatric hold. He was not taking his psychotropic medications, and was hearing voices. According to the reporting party, R.M. had experienced auditory hallucinations in the past, telling him to kill and eat I.M.

---

[1] All further statutory references are to the Welfare and Institutions Code.

2

A Department social worker visited the family's home, a converted garage. It was unkept with trash strewn about and a foul odor, and there was limited food in the home. Mother reported that father suffers from schizophrenia and had recently been hospitalized because of his mental health. Father had suffered from mental health problems for years, but stopped taking his medication in December 2017. He did not consistently receive mental health services, and had attempted suicide several times, hitting himself in the head with a brick, stabbing himself, hurting himself with a power drill, and jumping off a bridge, resulting in significant injuries. Two of the suicide attempts happened in the presence of the children. A.I. confirmed that he twice saw father try to kill himself with "big and little kni[v]es" and yelling that he wanted to kill himself.

According to mother, father never hurt her or the children. Mother was aware father heard voices telling him to kill I.M, and told the Department she did not leave the children alone with father. However, a neighbor reported that he saw mother leave I.M. home alone with father. Mother admitted it was difficult to care for the children and father.

A.I. and I.M. have extensive special needs. A.I. was diagnosed with ADHD and oppositional defiant disorder, and was currently taking medication and receiving services. He has an IEP and takes special education classes.

I.M. suffers from a severe speech disability and was participating in speech therapy. She also has an IEP. At the time the Department became involved with the family, she was five years old but could only say a few words.

I.M.'s teacher was concerned she was being neglected. She was often absent from school and exhibited poor hygiene, wearing

the same clothes for days in a row.  She often suffered from incontinence, but mother failed to provide clean clothes for her, and did not respond to the school's calls home.

A.I.'s therapist told the Department A.I. is afraid to shower because of the condition of the family home.  There are roaches and mice, and tree roots growing into the shower.  He becomes easily upset and throws tantrums, and the condition of the family home is a trigger for his negative behaviors.

Father admitted he had undergone three psychiatric hospitalizations, and that he was most recently hospitalized because he was hearing voices telling him to kill himself.  A year earlier, father heard voices telling him to eat I.M., but he did not want to hurt the children.

Mother and father agreed to a safety plan where father would participate in mental health services and take his prescribed psychotropic medications.

By April 2018, father had only attended one mental health visit.  He was taking multiple medications and appeared "out of it" and looked to mother to speak for him and respond to the social worker's questions.

In May 2018, the Department obtained a removal order and the children were placed in foster care.  Mother could not understand why the children were removed.  She insisted they were doing fine in her care.

The family has an extensive child welfare history dating back to 2003.  From 2016 and forward, there were three referrals for neglect based on the poor condition of the family's home (including pest infestations, filthy conditions, and lack of running water), and father's untreated mental health issues, including involuntary hospitalizations and suicide attempts.  The referrals

were closed after the home conditions were corrected and father engaged in services.

A 2013 referral was substantiated after mother left infant I.M. home alone without any supervision. The family received family maintenance services for 12 months before the voluntary case was closed.

A 2009 referral was substantiated. Mother left nine-year-old H.G. (now an adult) and one-year-old A.I. home alone several times a week for hours at a time. H.G. was scared to be left alone, and was exhibiting signs of depression and anxiety. The family was referred to counseling services.

A 2003 referral for H.G. was substantiated based on domestic violence between mother and H.G.'s father. Mother was referred to services and told to follow up with the family court.

At the May 24, 2018 adjudication and disposition hearing, the juvenile court sustained allegations under section 300, subdivision (b) that father's mental illness, and mother's failure to protect, placed the children at risk of harm, removed the children from mother and father, and ordered mother and father to participate in family reunification services. Mother was ordered to participate in parenting classes, individual counseling, and a National Alliance on Mental Illness (NAMI) support group. Father was ordered to receive mental health counseling, individual counseling, to participate in a psychiatric evaluation, and to take his prescribed medications.

Father again attempted suicide in September 2018, and was placed on an involuntary psychiatric hold after mother called police. Mother told the Department father had also tried to hurt himself in July but she had not reported it to police.

5

Nevertheless, mother said father was doing well, seeming to minimize the extent of his illness.

A.I. continued to receive special education services for an auditory processing delay. I.M. began receiving regional center services, and was diagnosed with a mild intellectual disability, and expressive language delay. She was also attending special education classes.

Mother made good progress with her reunification services. She completed a parenting class in August 2018, and started individual counseling in May 2018. She was diagnosed with adjustment disorder.

In October 2018, following his psychiatric hospitalization, father was transferred to an inpatient, residential treatment facility where he could receive long-term intensive care.

The August 2019 status review report noted that the children were doing well in their placement, although A.I. would sometimes isolate in his room, and hit his sister and foster sibling. I.M.'s speech was unclear but was improving. Mother had made progress with her counseling, and was attending NAMI support group sessions. She had also started working at a temporary job. She attended IEP meetings for the children, but it had been difficult for teachers to contact mother to arrange the meetings.

Mother's progress began to falter. When the Department social worker met with mother, she often seemed more interested in talking on the phone with father than with discussing the case with the social worker. She also had not found new housing and continued to live in the converted garage. The home's bathroom had a visible mold problem, with a leaking shower and condensation on the walls. According to mother, the landlord

would not fix the many problems with the home. Moreover, mother's adult son was living in a room attached to the garage and was believed to be using drugs.

The Department provided mother with housing referrals to help her obtain new housing, but mother had not made any effort to find new housing. She did not have a plan to make her home safe if the children were returned to her.

Mother completed 15 sessions of individual counseling, and had "gained awareness and confidence in the need to raise her children alone." She also completed NAMI group sessions. Father attended the sessions with mother.

Mother and father were consistently visiting the children, often together. The foster caregiver was concerned that they were not spending quality time with the children as they would let them play on their phones. In May 2019, mother's visits were liberalized to allow unmonitored visits, and A.I. reported they went well.

The Department recommended that mother continue individual counseling to address codependency and child protection. At the August 2019 review hearing, the court ordered that parents receive additional reunification services.

The Department's February 2020 status review report noted that A.I. and I.M. were thriving in their foster placement. However, mother had made only marginal progress in understanding why her children were detained. She also had made no effort to obtain alternate housing, and much needed repairs had not been made to her home. Mother canceled meetings with the social worker and service providers, and had absences from work because she was ill. She also did not return calls from I.M.'s teacher so that her IEP could be approved.

Therefore, much needed services could not be provided to I.M. The Department informed mother she was likely ill because of the mold problem in her home. She blamed the Department for her financial circumstances, claiming she was too busy working on case issues.

Mother's visits were further liberalized to include eight-hour unsupervised visits. However, the visits did not go well. Mother did not plan activities for the visits, and the children would return hungry because mother did not have money to feed them. Her visits were reduced to four hours so the children could eat before and after the visits. Mother would also join father for his supervised visits.

In January 2020, mother moved into a homeless shelter so she could obtain housing resources. There were concerns about substance abuse, as she had lost a great deal of weight and looked unhealthy. However, mother subsequently tested negative for drugs. The shelter reported that mother could live there for up to a year, and that there were other families living there with their children.

The section 366.22 review hearing was continued a number of times because of the COVID-19 pandemic and safer at home orders.

A June 2020 last minute information for the court reported that mother had resumed counseling in October 2019, and had attended seven sessions, but was terminated from the program after she failed to contact the provider for continued treatment. She was addressing depression and communication skills in counseling. Mother was residing at the L.A. Restoration Church. The shelter could not be evaluated for placement of the children because of strict COVID-19 rules. However, the Department

social worker was able to briefly meet with mother and her case manager at the shelter.  The case manager reported that mother was doing well and participating in various groups at the shelter, but did not specify what services mother was receiving there.  Her children could live there if they were released to mother.

A September 2020 review report noted that mother was participating in domestic violence classes, anger management classes, drug and alcohol counseling, and individual and group counseling at the L.A. Restoration Church.  She also had two therapy sessions at St. John's Well Child & Family Center.  She was diagnosed with adjustment disorder, and it was recommended that she continue in therapy.

The Department was concerned about mother's ability to care for the children and address their special needs, so the Department recommended that reunification services be terminated.

The section 366.22 permanency review hearing was held on September 29, 2020.  The court found the parents had not made substantial progress in alleviating the circumstances that led to the removal of the children, and that it would be detrimental to return the children to their parents.  The court terminated reunification services, and set a section 366.26 permanency planning hearing.  The court reasoned that "it does not appear that mother, despite her completing a class plan, has made substantial enough efforts to . . . provide for her own needs, she appears to be completely dependent upon the L.A. Restoration Church . . . ."  The court recognized the children had special needs and required significant support, and that mother had not made sufficient progress to provide the support the children needed.

Mother filed a timely notice of intent to file a writ petition, and the present petition for extraordinary relief followed.

## DISCUSSION

When a child over the age of three years is removed from a parent, the child and parent are typically entitled to 12 months of reunification, which may be extended to 18 months. (§ 361.5, subd. (a)(1)(A) & (3)(A).) Pursuant to section 366.22, within 18 months after a dependent child is removed from the physical custody of his or her parent, a permanency review hearing must occur to review the child's status. (§ 366.22, subd. (a)(1).) At the hearing, the juvenile court "shall order the return of the child to the physical custody of his or her parent or legal guardian unless the court finds, by a preponderance of the evidence, that the return of the child to his or her parent or legal guardian would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." (*Ibid.*) We review the juvenile court's detriment finding for substantial evidence. (*Jennifer A. v. Superior Court* (2004) 117 Cal.App.4th 1322, 1341.) We construe the evidence and resolve all evidentiary conflicts in the light most favorable to the juvenile court's determination. (*In re R.T.* (2017) 3 Cal.5th 622, 633; *In re David H.* (2008) 165 Cal.App.4th 1626, 1633.)

A parent's compliance with the case plan is not the only factor the juvenile court must consider in deciding whether to return a child to the parent's care. (*Constance K. v. Superior Court* (1998) 61 Cal.App.4th 689, 704; *In re Dustin R.* (1997) 54 Cal.App.4th 1131, 1139–1140.) Where the parent has complied with their case plan, the question is not whether the parent has participated in services, but whether the parent has

10

benefited from those services.  (*Blanca P. v. Superior Court* (1996) 45 Cal.App.4th 1738, 1748.)

Mother contends she completed her case plan, and benefitted from services, and that her "primary struggle was not a failure to benefit from her programs but rather poverty." Relying on *In re Yvonne W.* (2008) 165 Cal.App.4th 1394 (*Yvonne W.*), mother argues that the lack of suitable housing, alone, does not constitute substantial evidence of detriment.

In *Yvonne W.*, Yvonne was removed from her mother's custody based on mother's marijuana use and arrest on drug charges.  (*Yvonne W.*, *supra*, 165 Cal.App.4th at p. 1397.)  Mother enrolled in a residential treatment program, completed a parenting class, participated in individual therapy, and submitted to a psychological evaluation.  Mother was knowledgeable about positive parenting techniques and took responsibility for her bad choices.  (*Ibid*.)  By the 18-month review hearing, mother remained sober, had found housing at a shelter, and was having unsupervised weekend visits with Yvonne.  (*Id*. at pp. 1398–1399.)  Nevertheless, the juvenile court found that returning Yvonne to mother's custody would create a substantial risk of detriment because Yvonne had expressed fear, anxiety, and unhappiness with mother's living arrangement. (*Id*. at p. 1399.)  The Court of Appeal reversed, finding that the juvenile court's detriment finding was based solely on mother's housing situation, which posed no risk of detriment to Yvonne. (*Id*. at pp. 1401–1402.)

Here, the risk of detriment was not based solely on mother's housing situation, but instead on mother's lack of independence, and concerns about her insight and ability to care for her special needs children.  Mother received years of

11

reunification services (including extensive services for her previous voluntary case and prior referrals), but had made minimal progress in changing her circumstances. She was at times uncooperative with providers, delaying I.M.'s services to address her special needs, and only recently sought new housing, despite the Department's repeated attempts to engage her with services to address her housing situation. Moreover, mother was still preoccupied with father, attending visits with him and calling him when she should have been discussing the case with social workers. While mother laudably engaged in many services, there was scant evidence she improved her capacity to protect her children.

## DISPOSITION

The petition is denied. This opinion is final forthwith as to this court pursuant to rule 8.490(b)(2)(A) of the California Rules of Court.


GRIMES, J.

WE CONCUR:


BIGELOW, P. J.


WILEY, J.

12