Filed 9/1/22  P.G. v. Superior Court CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| P.G. et al., | B319064 |
| Petitioners, | (Los Angeles County Super. Ct. No. DK05400B-C) |
| v. | |
| LOS ANGELES COUNTY SUPERIOR COURT, | |
| Respondent; | |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, et al., | |
| Real Parties in Interest. | |

ORIGINAL PROCEEDING; petitions for extraordinary writ.  Superior Court of Los Angeles Court, D. Zeke Zeidler, Judge.  Petitions denied.

Petitioner P.G in Pro Per (mother).

Petitioner J.C. in Pro Per (father).

No appearance for Respondent.

Dawyn R. Harrison, Acting County Counsel, Stephen Watson, Deputy County Counsel, for Real Party in Interest Los Angeles Department of Children and Family Services.

Michael Ono, Children's Law Center, for Real Parties in Interest L.C. and N.C. (minors).

Law Office of Emily Berger and Dominika Campbell for Real Parties in Interest D.C. and S.I. (legal guardians).

_____

## I.    INTRODUCTION

Petitioners P.G. (mother) and J.C. (father) each petition for extraordinary relief from the juvenile court's order terminating reunification services and setting the matter for a permanency planning hearing pursuant to Welfare and Institutions Code section 366.26.[1]

Dependency proceedings were first filed in 2014. After an unsuccessful reunification period, paternal grandparents were named legal guardians to minors L.C. and N.C. in 2016. Five years later, father and mother successfully sought reinstatement of reunification services by way of a section 388 petition. After 10 months, the juvenile court again terminated reunification services, finding it was not in the children's best interests to continue the renewed reunification efforts. We find no error and deny mother's and father's petitions.

_____

[1]    Unless otherwise specified, all further statutory references are to the Welfare and Institutions Code.

2

## II. BACKGROUND

### A. Prior Dependency Proceedings and Reinstatement of Reunification Services

In 2014, the Department of Children and Family Services (DCFS) filed section 300 petitions against mother and father on behalf of two-year-old L.C. and her newborn brother, N.C. Both children were eventually placed with paternal grandfather and step-paternal grandmother. Following an unsuccessful reunification period, paternal grandparents were declared L.C. and N.C.'s legal guardians in 2016.

On November 23, 2020, the parents filed section 388 petitions seeking reinstatement of reunification services. After several continuances for reasons unrelated to the issues on appeal, the court heard the section 388 petitions on May 4, 2021. At the time of the hearing, L.C. was eight years old and N.C. was six. According to reports submitted by DCFS, L.C. identified her legal guardians as "mom and dad" and referred to mother and father by their first names. N.C. referred to step-paternal grandmother as "mama" and said of her: "I always want to be with her. I love her so much."

Grandfather told a social worker he had wanted legal guardianship "to allow [mother and father] . . . to have the opportunity to be parents to their children" but he "didn't know it would be so long, that the children would have roots like they have here with us." Step-paternal grandmother reported that L.C. and N.C. "see us as their mom and dad" and call mother and father by their first names. When L.C. first came to their home after some time in foster care, she had behavioral and sleep problems. After therapy, Wraparound services, and "rules [that] are always the same," L.C. "is doing really, really good" now.

DCFS recommended denying the parents' section 388 petitions. It acknowledged parents had made "much progress," but opined that "[t]he children view their Guardians as their parents and unfortunately, the years away from their parents has left them without an established parent/child bond . . . and the children do not want to live with the parents." It noted legal guardians "have not helped to support the parent/child relationship for reasons that are assessed as protective and also as a result of some animosity . . . ."

On May 4, 2021, the juvenile court granted the parents' section 388 petitions and reinstated reunification services. Parental visits remained monitored.

**B.      *Second Reunification Period***

On August 4, 2021, mother's counsel submitted a walk-on request that the court admonish legal guardians not to interfere with the parents' reunification services. Attached was a letter from the family's therapist, Tony Rescigno, who offered his "current and professional opinion that the legal guardians are doing all they can to impede the reunification process between the children and their biological parents."

The juvenile court ordered legal guardians to transport the children to visits and directed DCFS to facilitate family counseling between the parents and legal guardians. On August 18, 2021, the parents and legal guardians participated in the first of several conjoint therapy sessions with Rescigno. On August 25, 2021, the family therapy session also included L.C. and N.C. However, DCFS reported that visits between the parents and children on August 20, 2021 and August 27, 2021 were "unsuccessful."

4

On August 20, 2021, the children refused to get out of the car for their visits with mother and father. At the social worker's urging, step-paternal grandmother picked up N.C. and put him outside the car, but N.C. ran back into the car. L.C. and N.C. continued this behavior for 30 minutes. They ran around the car, once locked the car, squeezed juice onto the floor, and argued and physically hurt themselves. The social worker ended the visit. Afterward, mother and father told the social worker they had not had visits in over nine weeks and believed the children were acting this way because too much time had passed.

On August 27, 2021, the children again refused to get out of the car for their visit with parents. Whenever the social worker or the parents tried to talk to them through the car windows, L.C. and N.C. would close the windows and lock the doors. Again, the social worker ended the visit after 30 minutes because the children were getting violent and hurting each other.

Legal guardians reported that N.C. soiled his pants during one of the visits and had become very fearful and overly attached to step-paternal grandmother. L.C. was also having trouble concentrating at school. Tasks that previously took her 15 minutes were taking an hour or more. Step-paternal grandmother said L.C. "has become very defiant lately and becomes very irritable when she knows she is going to conjoint therapy with the parents or the monitored visits."

In anticipation of a November 4, 2021 permanency planning review hearing, DCFS reported the parents have been "very consistent" with their visitation and always showed up with gifts, toys, activities, and food for the children. It also reported legal guardians were providing "excellent care and supervision" for L.C. and N.C. The children had a "very strong emotional

bond" to legal guardians, viewed them as parental figures, and were very affectionate toward them.

Dr. Shuham, L.C.'s psychiatrist, reported that L.C. had regressed and become more withdrawn and irritable since reinstatement of reunification services. He believed the recent increase in visitation with the biological parents and discussions about L.C.'s possible removal from her current home had negatively affected her. L.C. had been prescribed Adderall, and doctors had successfully reduced her medication over time, but Dr. Shuham believed L.C. may need Hydroxyzine or Atarax to treat her "surging" anxiety prior to visits with mother and father. Dr. Shuham believed reinstatement of reunification services had affected L.C. "tremendously" and urged the court to "think of the well-being of the child [and] not of the family as a whole."

Although the parents had made significant progress and were compliant with their case plans, DCFS recommended termination of reunification services. There was "little to no" bond between the parents and the children. In contrast, the children have "a very close and trusting bond and relationship" with their legal guardians, who have "given the children love, protection and stability for many years." DCFS believed that removing L.C. and N.C. from their current home would be detrimental to them.

On November 4, 2021, the juvenile court ordered an evaluation pursuant to Evidence Code section 730 to assess the relationship between the parents and children. The evaluator, Dr. Alfredo Crespo, reported the children "dramatically" and "actively resisted" getting out of the car and going into his office, agreeing to go inside only when the grandparents told the children their parents would not be there.

6

During their meetings with Dr. Crespo, the children were offered an opportunity to have a virtual call with the parents, but both children "roundly refused." N.C. said mother and father were "strangers who might kidnap us." He said he had lived with legal guardians, who he identified as "my mom and dad," for "one thousand and a million . . . years." L.C. said mother and father "are mean" and added she was "afraid . . . if they take us . . . to their house."

Dr. Crespo recognized the parents "have made great strides in their lives and are obviously greatly motivated to reconstitute a relationship with their children." However, over the past seven years, the children have become "understandably attached" to paternal grandparents, who "have provided stability and structure the parents could not as much as offer to match" at the time. He opined that the parents "significant improvements took so long, relative to the minors' ages, that . . . an imminent return to the parents' care is as unlikely as it may be ill-advised."

He felt, however, that the children may benefit, long-term, from eventual re-establishment of a relationship with their parents. In light of the "deep estrangement" between father and paternal grandfather, Dr. Crespo recognized legal guardians were unlikely to cooperate in any plan designed to culminate in the eventual, successful return of L.C. and N.C. to the parents' care. With conjoint therapy, however, they may agree the children's best interests are served through a reasonable visiting relationship between the parents and the children.

In a letter dated December 28, 2021, the family's therapist, Dr. Rescigno, stated he had completed 57 therapy sessions with the family since April 2021. Starting in July 2021, however, the children have avoided therapy and "do[ ] what they can to avoid

being seen on screen." Dr. Rescigno believed the children may have been reacting out of fear, due to uncertainty and confusion regarding the reunification process. He opined that maintaining visitations, while reducing the frequency of other court-mandated sessions, would give L.C. and N.C. more comfort in continuing to develop a relationship with the parents "who, time and time again, have proven their commitment and dedication to their children."

## C. *Termination of Reunification Services*

The juvenile court began the February 25, 2022 pre-permanency hearing by noting it had been impressed "with how far the parents have come, how hard they've worked, the incredible progress they've made, and was really hoping that . . . the children would be able to see that. But up until this point, they don't seem to be willing to recognize that." It also commended legal guardians for "having really made an effort, as well. They've been participating in family counseling with the parents, and at times have tried to encourage the children to participate in the visits. We don't have information that the guardians have done anything to poison the situation."

Minor's counsel and DCFS sought termination of the parents' reunification services, arguing that continued efforts were not in the children's best interests. They also urged the court not to order further conjoint therapy sessions and instead continue visitation only, to give the children and legal guardians "a little time and space to breathe" and to "let the children recover from this process," which they described as "a long road" that has taken a "toll" on both the children and legal guardians.

The court did not rule at the February 25, 2022 hearing but trailed the matter until March 1, 2022.

At the continued hearing, the juvenile court found that parents have "definitely shown a clear change of circumstance" and were in compliance with the case plan.  Nonetheless, it could not find that it was in the children's best interests to grant further reunification services or to return the children to parents' care.  (See *In re Michael D.* (1996) 51 Cal.App.4th 1074, 1086-1087 ["burden of proof to modify a permanent placement plan is by a preponderance of the evidence to prove both changed circumstances and that the best interest of the child would be a change in placement to the parent's home."])  The court terminated reunification services and set the matter for a permanency planning hearing pursuant to section 366.26.  The court also ordered continued visitation and therapy for the children, with participation in family therapy with the parents and legal guardians upon recommendation of the children's therapists.

On March 7, 2022, mother and father filed notices of intent to file a writ petition.  After appointed counsel filed letters pursuant to *Glen C. v. Superior Court* (2000) 78 Cal.App.4th 570, indicating they were unable to file petitions on the merits, mother and father each filed a petition in pro. per. on July 11, 2022.  Their principal argument was that their reunification efforts had been obstructed by legal guardians, but they also attached documents showing the progress they had made in reunification.  We invited counsel for the parents to file supplemental petitions if they believed additional briefing was warranted in light of the issues raised in the petitions filed directly by mother and father.  Neither counsel filed a supplemental petition.

On July 26, 2022, minors' counsel filed a response opposing the petitions.  DCFS and legal guardians joined in minor's response.  We stayed the section 366.26 hearing, issued an order to show cause, and now deny the petitions.

## III.  DISCUSSION

### A.  *Legal Principles and Standard of Review*

Where a juvenile court reinstates reunification services after a child is placed in the care of a legal guardian or other permanent living situation, it sets the next review hearing pursuant to section 366.3.  (*In re Jacob P.* (2007) 157 Cal.App.4th 819, 829.)  Under section 366.3, the juvenile court may order reunification services for a period of six months, plus an additional six months "as needed . . . in order to return the child to a safe home environment."  (§ 366.3, subd. (f).)

In determining whether return of the child to the parent is appropriate after reinstatement of reunification services, "a parent's interest in the care, custody and companionship of the child is no longer paramount.  [Citations.]"  (*In re Jacob P., supra,* 157 Cal.App.4th at p. 828.)  Rather, the juvenile court must base its determination on the best interests of the child.  (*Ibid.*)  "What is in the best interests of the child is essentially the same as that which is not detrimental to the child.  [Citation.]"  (*Id.*, at p. 829.)

An order terminating reunification services is reviewed for substantial evidence.  (*J.H. v. Superior Court* (2018) 20 Cal.App.5th 530, 535.)  The court's determination as to what is in the best interests of the children is reviewed for abuse of discretion.  (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318.)  Under either standard of review, we would reach the same result.

10

## B.	The Juvenile Court Did not Err in Terminating Reunification Services

The juvenile court did not err when it found that termination of reunification services was in L.C. and N.C.'s best interests.  L.C. was just two-years-old, and N.C. six-months, when they were placed with legal guardians (their paternal grandfather and step-paternal grandmother).  In the seven years since, they had built strong emotional bonds with legal guardians, eventually coming to see them as their parents.  "The passage of time is a significant factor in a child's life; the longer a successful placement continues, the more important the child's need for continuity and stability becomes in the evaluation of her best interests.  [Citation.]"  (*In re J.Y.* (2022) 76 Cal.App.5th 473, 486.)  The uncontradicted evidence is that L.C. and N.C. are happy, stable, and well-cared-for in legal guardians' home.

There is also ample evidence that removing L.C. and N.C. from legal guardians' home and returning them to the parents' care would be detrimental to their emotional well-being.  From the time of the reinstatement of reunification services, both children had reacted poorly to the prospect of spending more time with their biological parents and possibly reuniting with them.  Visits with the parents were fraught, as both children were unwilling to engage.  They refused to exit the car for visits with the parents, and when forced to get outside the car, they ran back inside, locked the doors and windows, became violent, and hurt one another.

L.C.'s psychiatrist observed that L.C. had regressed and become withdrawn and irritable since reunification services had been reinstated.  Her anxiety had "surged" and the psychiatrist believed he might need to prescribe new medications before

11

parental visits.  N.C. soiled his pants during a visit and had become fearful and overly attached to step-paternal grandmother.

Both children "dramatically" and "actively resisted" getting out of the car and going into Dr. Crespo's office, agreeing to go inside only when assured mother and father would not be there. N.C. said mother and father were "strangers" and expressed fears they might "kidnap" him and L.C.  His sister was "afraid . . . if [mother and father] take us . . . to their house."

Although the children's wishes are "not determinative" of their best interests, their statements and preferences as to who they want to live with "constitute[] powerful demonstrative evidence it would be in [their] best interest[s] to allow [them] to" live with the parents or guardians of choice.  (*In re Michael D.* (1996) 51 Cal.App.4th 1074, 1087.)

L.C. and N.C.'s stated preferences were echoed by professionals who had evaluated them and the family.  Dr. Crespo opined that mother and father's "significant improvements took so long, relative to the minors' ages, that . . . an imminent return to the parents' care is as unlikely as it may be ill-advised."  Dr. Shuham believed reinstatement of reunification services had affected L.C. "tremendously" and urged the court to "think of the well-being of the child [and] not of the family as a whole."

In light of the anxiety and distress experienced by the children at the prospect of reunification and increased contact with the parents, we conclude the juvenile court reasonably found that continued reunification efforts would not be in the children's best interests.  As the juvenile court recognized in making its decision, the parents were compliant with their case plan and had made "incredible progress" in their lives.  At the post-

12

permanency stage, however, the cornerstone of the juvenile court's analysis is the children's best interests and not the parents' progress.  (*In re Malick T.* (2022) 73 Cal.App.5th 1109, 1123; see also *In re Jacob P., supra,* 157 Cal.App.4th at pp. 830-831 ["a parent's compliance with the case plan is not a guarantee the child will be returned to the parent"]; *Constance K. v. Superior Court* (1998) 61 Cal.App.4th 689, 705 [affirming juvenile court's decision to set matter for a permanency planning hearing despite mother's compliance with "virtually all respects with the reunification plan" because there was substantial evidence that ending the "loving and stable relationship" between the children and their foster family and returning the children to mother would be detrimental to the children].)

The record also supports the juvenile court's statement that legal guardians "hav[e] really made an effort" and have not "done anything to poison the situation."  Although there is evidence legal guardians resisted visitation for a time for fear of Covid exposure, the record also shows they drove the children to visits, encouraged the children to get out of the car and interact with the parents and, on at least one occasion, even physically picked up N.C. and set him down outside the car.  Legal guardians also participated in family counseling with the parents.  The record demonstrates that, ultimately, it was the parents' lack of bond with the children, and the children's exceptionally strong bond with legal guardians, that hampered the parents' reunification efforts.

## IV.   DISPOSITION

The petitions for extraordinary writ are denied.  Our stay order issued July 12, 2022 is vacated.


RUBIN, P. J.

WE CONCUR:



BAKER, J.



KIM, J.