Filed 10/10/23  Y.R. v. Superior Court CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| Y.R., | |
| Petitioner, | E081720 |
| v. | (Super.Ct.Nos. J291079 & J291080) |
| THE SUPERIOR COURT OF SAN BERNARDINO COUNTY, | |
| Respondent; | OPINION |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | |
| Real Party in Interest. | |

ORIGINAL PROCEEDINGS; petition for extraordinary writ.  Cara D. Hutson,

Judge.  Petition denied.

Friedman and Cazares, and Valeria Sosa-Sandoval, for Petitioner.

No appearance for Respondent.

1

Tom Bunton, County Counsel, and Pamela J. Walls, Special Counsel, for Real Party in Interest.

The juvenile court terminated family reunification services for petitioner Y.R. (mother) and set a Welfare and Institutions Code section 366.26 hearing.[1] She seeks an extraordinary writ, arguing there was insufficient evidence to support the court's conclusion that returning her children to her posed a risk of detriment to them. We deny the petition.

BACKGROUND

Mother has three children, the youngest two of which are the subjects of this dependency: K.R. (born 2005), A.O. (born 2018), and E.R. (born 2019). K.R. is not a subject of this dependency because he turned 18 during the proceedings. Mother and father began living together in 2001 and married in 2013.

Mother had two other dependency cases before this one; one from May to October 2018, and another from August 2019 to July 2020. Both involved substantiated allegations of substance abuse and family maintenance services.

In October 2021, mother was charged with possession of controlled substances. A little less than two weeks later, mother led police on a high-speed chase with a stolen car, driving 70-80 miles per hour and through red lights with E.R. in the car. Police followed her to the motel where she was staying with father and her two youngest children. Mother fled into the motel, leaving E.R. in the car. Police arrested mother. They also

_____

[1] Undesignated statutory references are to the Welfare and Institutions Code.

2

arrested father on suspicion he was involved in the theft of the vehicle. San Bernardino County Children and Family Services (the department) received a referral alleging neglect of all three children.

The department filed petitions under section 300 for all three children, though only those pertaining to A.O. and E.R. are relevant here. The petitions alleged, among other things, that mother was incarcerated and therefore unable to provide care, and she had a substance abuse problem which impaired her ability to provide care. The court held a detention hearing, found the petitions stated a prima facie case, removed the children, and ordered supervised visitation for the parents whenever they were released from custody.

Mother pled guilty to the charges related to her high-speed chase and was sentenced to a year-long child abuse prevention class. The department spoke to her in November 2021, after her release, and she denied any drug use, despite her recent charge for possession of controlled substances. The department recommended reunification services but noted that "[mother] will need to fully engage and show benefit from the treatment services," because this was the third time the department had intervened due to her substance abuse.

As of February 2022, father claimed to have moved into a new home, and mother claimed she was not planning to move in with him. Mother started services but had not started drug treatment and missed four of six drug tests. The parents participated in mediation, where they agreed to certain reunification services and agreed not to contest

jurisdiction. At the jurisdiction/disposition hearing, the court ordered supervised visitation and reunification services.

In March 2022 the children's caregiver requested that the children be placed elsewhere due to issues with father. The caregiver reported father would ignore the caregiver, give the children candy, and be dismissive during visits. The children were placed with a maternal relative, but the parents' visitation issues became worse. The parents argued in front of the children during visits, which eventually caused the department to confront them. In particular, father yelled at mother, blaming her for the dependency. The parents also made promises to the children about visits, but were not consistent with visitation. The caregivers reported that the children were more defiant after visits, and that after one visit A.O. defecated on herself for three days despite being toilet-trained.

In June 2022 the department received a referral alleging father sexually abused A.O.

As of August 2022, the department was still investigating father's alleged sexual abuse. Mother was living with father and had been terminated from her year-long child abuse program. However, she completed her services as of July 29, 2022, and consistently attended and tested negative at drug tests.

The department expressed concern that mother was the victim of domestic violence. The department was informed that father did not allow mother to attend services alone, that he had cameras in the home, and that he would not permit mother to

4

video call the children without him present, among other controlling behaviors. Mother denied any domestic violence, but admitted father yelled at her and they struggled with communication. Accordingly, at the six-month review hearing the court ordered separate supervised visitation and domestic violence referrals. It also ordered the department to separately assess the parents for unsupervised visits.

The department filed new petitions for the children in October 2022 alleging father sexually abused the children and mother failed to protect them. A.O. showed a forensic interviewer how father touched her genitals, explained that father touched her " 'pee-pee' " hard, and said it hurt. A.O. said mother was home in another room and her older sibling K.R. was not home when it happened. Mother speculated that the alleged abuse could have occurred under a foster father, but A.O.'s story was clear that mother and K.R. were living with them at the time, and she identified a photo of father as the perpetrator. A foster father also reported seeing A.O. engage in sexualized behavior once—touching another child on her private parts and trying to kiss her on the mouth.

The court held a detention hearing on this second petition, and found the petition stated a prima facie case. It vacated the following review hearing and set a jurisdiction/disposition hearing on the second petition for that date instead.

In November 2022 the court set a contested jurisdiction/disposition hearing for January 2023. It also informed the parents that it would consider terminating reunification services after the hearing.

5

At the contested jurisdiction/disposition hearing, the court modified the sexual abuse allegation to allege only that father inappropriately touched A.O. causing her pain and putting her at risk of sexual abuse. It then found the allegation true as modified, and dismissed the allegations that mother failed to protect the children. Accordingly, the court continued reunification services to both parents. It also ordered unsupervised visitation for mother, but instructed mother that she was not to have any contact with father during these visits.

According to mother, she and father started living separately sometime in December 2022. In February 2023 father told the department he and mother were living in the same apartment complex but in different apartments. However, they were otherwise still together, and father said their plans were to reunite and live together again.

Mother had her first unsupervised visit the same month. After the visit E.R. told the caregiver she saw father. A.O. initially disagreed but then admitted they did see father. A.O. said mother had told them not to tell the caregiver. A.O. also told the caregiver that father had promised to take her to get her nails done. Father told the children not to behave at the caregiver's home and promised they would be returning to live with mother and father. Shortly after unsupervised visits started E.R. started throwing tantrums and urinating on herself when she was upset. E.R. also woke up crying and saying, "no daddy."

In March the department spoke to mother, who acknowledged that she was not to have contact with father during visits. She denied that they did. She said the children were lying about seeing father, and that she talked to them about not lying. She also told the department she was separated from father and planned to raise the children alone.

However, later that month the department received a report that mother took the children to her home during a visit and that father was there as well. Mother denied this and provided a receipt showing she had gone to a McDonald's, a seven-minute drive from where the caregiver had dropped her and the children off. Nevertheless, the department temporarily transitioned back to supervised visitation. A.O.'s behavior improved after the transition.

As of April 2023, mother was participating in services, had completed portions of her case plan, entered a drug treatment program, and consistently tested negative for drugs.

Despite mother's progress on her case plan, the department recommended terminating reunification services. The department made this recommendation in large part because it believed mother was not following visitation guidelines, was giving father access to the children, was not forthcoming with the department, and was generally failing to protect the children.

The court held a contested 18-month status review hearing in July 2023. Mother, father, and the social worker testified at the hearing. After hearing testimony and argument, the court expressed concern about mother's ongoing relationship with father and the credibility of her testimony. Specifically, it understood "that [mother] and [father] still love each other very much," and that "[father] wants to get back together." The court found it hard to believe "that [mother] and [father] live within ten minutes of each other, yet [mother] doesn't even know where he lives," saying that "defies credibility." Moreover, the court was skeptical of mother's testimony and intentions generally, saying "[mother] only wants her kids back so she's saying whatever the Court wants to hear in order to get the kids back," and "if part of that plan involves reunifying with [father] it will be an issue." Finally, the court was "greatly disturb[ed]" by the "external indicia by the children of the way their bodies are reacting and acting out."

Accordingly, the court found the department had provided reasonable reunification services, that both parents were actively involved in their case plans, but that returning the children to their custody would be detrimental and that the extent of the parents' progress was minimal. The court terminated reunification services, set a permanent plan of adoption, and set a section 366.26 hearing.

DISCUSSION

Mother contends that the juvenile court erred in terminating her services and setting a permanency planning hearing because there was no evidence of risk of detriment to the children. We are not persuaded.

8

When a court removes a child under the age of three from the physical custody of their parents, the court must order reunification services for at least six months from the dispositional hearing, but no longer than 12 months from the date the child entered foster care, unless the child is returned to the parent's home. (§ 361.5, subd. (a)(1)(B).) However, services may be extended up to 18 months from the date the child was removed from the parent's physical custody if the court finds a substantial probability that the child will be returned to the parents' physical custody within that time, as was the case here. (See § 361.5, subd. (a)(3)(A).)

At an 18-month review hearing a court must return the child "unless the court finds, by a preponderance of the evidence, that the return of the child to their parent or legal guardian would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." (§ 366.22, subd. (a)(1).) "We review an order terminating reunification services to determine if it is supported by substantial evidence." (*Kevin R. v. Superior Court* (2010) 191 Cal.App.4th 676, 688.) "In making this determination, we review the record in the light most favorable to the court's determinations and draw all reasonable inferences from the evidence to support the findings and orders." (*Id.* at pp. 688-689.) "[A]ll conflicts are to be resolved in favor of the prevailing party, and issues of fact and credibility are questions for the trier of fact." (*In re Ricardo L.* (2003) 109 Cal.App.4th 552, 564.)

"Though usually the case, a parent's compliance with the case plan is not a guarantee the child will be returned to the parent." (*In re Jacob P.* (2007) 157

9

Cal.App.4th 819, 830.)  Indeed, courts considering whether to terminate reunification services can consider a wealth of other factors.  Most importantly for our purposes, these factors include "whether the natural parent maintains relationships with persons whose presence will be detrimental to the ward," and "the manner in which the parent has conducted himself or herself in relation to a minor in the past."  (*Constance K. v. Superior Court* (1998) 61 Cal.App.4th 689, 705.)

Substantial evidence supports the juvenile court's finding that mother was maintaining a relationship with father, and therefore that returning the children to mother posed a substantial risk of detriment.  The court found true the allegations in the second section 300 petition that father inappropriately touched A.O., and so father posed a genuine risk of harm to the children.  Nevertheless, there is ample reason to believe that mother allowed father to have contact with the children during her unsupervised visits in violation of court orders.  Both children reported seeing father during visits with mother, and even provided detailed stories about promises father made to them and statements he made instructing them to misbehave at their placement.  E.R. also started misbehaving after transitioning to unsupervised visits, urinating on herself and crying out "no daddy" in her sleep.  When they transitioned back to supervised visits with mother, there were no further reported issues with E.R. and the caretakers reported A.O.'s behavior improved. All this evidence suggests that not only was there a risk that mother would allow contact between father and the children, but that she had already done so.

10

There was also substantial evidence to allow the court to conclude mother would continue to allow father access to the children. While mother claimed to be separated, she always lived near father—at some points in the same complex—was still married to him, and generally appeared to still have a close relationship to him. Meanwhile, father was clear that he believed they were still together and that they had plans to reunite. These facts alone are sufficient to conclude that mother would continue her relationship with father and otherwise give him access to the children despite the risk of danger he posed.

Mother argues this evidence is not sufficient because there is no independent corroboration of the claims that she allowed father to see the children aside from what the children told the department. That may be so, but that is a factual and credibility dispute which the juvenile court has already decided and which we cannot reconsider. The question on review is not whether the trial court's factual determinations are compelled by the record, only whether they are sufficiently supported. On that question we agree with the juvenile court that the children's statements, father's statements, the children's behaviors, and the circumstantial evidence that mother and father lived near each other, were sufficient to conclude returning the children to mother posed a risk of detriment to the children.

Accordingly, we conclude the juvenile court's decision to terminate reunification services and set a section 366.26 hearing was supported by substantial evidence.

11

## DISPOSITION

We deny the writ petition.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAPHAEL _____
                                                                              J.

We concur:


McKINSTER _____
                Acting P. J.


FIELDS _____
                J.

12